```
                                                    ┌─────────────────────────────┐
                                                    │ USDC SDNY                   │
UNITED STATES DISTRICT COURT                        │ DOCUMENT                    │
SOUTHERN DISTRICT OF NEW YORK                       │ ELECTRONICALLY FILED        │
------------------------------------------------X   │ DOC #: _____    │
FERDO GRGUREV and OMER GRGUREV,            :        │ DATE FILED: 11/10/2016      │
individually and derivatively,                      └─────────────────────────────┘
                                           :

                           Plaintiffs,     :              1:15-cv-9805-GHW

                                           :
       -against-                           :           MEMORANDUM OPINION
                                           :               AND ORDER
MILAN LICUL, BRANCO TURCINOVIC,            :
DENNIS TURCINOVIC, FIVE "M" CORP., 268     :
SH RESTAURANT CORP., DELMONICO'S           :
DISTRIBUTION LLC, and 268 SH               :
RESTAURANT CORP.,                          :
                                           :
                           Defendants,     :
               -and-                       :
                                           :
  OCINOMLED LTD. and 50/50 RESTAURANT      :
  CORP.,                                   :
                                           :
                   Nominal Defendants.     :
------------------------------------------------X
```

GREGORY H. WOODS, United States District Judge:

Plaintiffs Omer and Ferdo Grgurev and Defendants Milan Licul and Branko Turcinovic are

equal co-owners of Ocinomled Ltd. and 50/50 Restaurant Corporation.  Am. Compl., ECF No. 26,

¶¶ 16-19.  Through these entities, they own two restaurants:  Delmonico's and Scaletta.  *Id.*  In this

action, Plaintiffs seek injunctive relief and damages on a variety of direct and derivative claims,

including trademark infringement, breach of fiduciary duty, conversion, and unjust enrichment.  *Id.*

¶¶ 135-220.  Defendants Licul and Turcinovic have brought derivative counterclaims on behalf of

50/50 Restaurant Corporation, alleging breach of fiduciary duty, conversion, and unjust enrichment

on the part of Plaintiffs.  ECF No. 18.  Licul and Turcinovic also petition the Court for dissolution

of 50/50 Restaurant Corporation.  *Id.* at 31-42.

On September 26, 2016, Defendants Milan Licul, Branko Turcinovic, Five "M" Corp., 268

SH Restaurant Corp., Delmonico's Distribution LLC, and 268 SH Realty Corp. moved to enforce a

settlement agreement purportedly entered into between Plaintiffs Omer and Ferdo Grgurev and Defendants Milan Licul and Branko Turcinovic.  ECF No. 71.  At base, Defendants argue that Plaintiffs repudiated a binding agreement to settle this case after experiencing a change of heart.  Plaintiffs, on the other hand, contend that the parties never reached a binding agreement.

The Court has reviewed the documents and argument submitted by both sides.  For the reasons that follow, the Court finds that there is no enforceable settlement agreement between the parties, and Defendants' motion is therefore DENIED.

## I.   THE PURPORTED SETTLEMENT AGREEMENT

Defendants do not present the Court with a formal settlement agreement executed by both sides.  Instead, Defendants contend that the parties reached a binding settlement agreement by virtue of an exchange of email messages.  *See* ECF No. 78, Memorandum of Law in Support of Defendants' Motion to Enforce Settlement Agreement ("Defs.' Mem.").  Plaintiffs, for their part, contend that the exchange of email messages establishes that no enforceable settlement agreement was ever formed.  In briefing this motion, the parties submitted various email messages and other documents to support their positions.

On July 27, 2016—one day before Plaintiffs were scheduled to take the deposition of Defendant and co-owner Milan Licul—Alan Trachtman, counsel for Defendants, sent an email to Jamie Brickell, counsel for Plaintiffs, stating:  "Jamie, this is to advise you that in the event Milan's deposition goes forward as scheduled tomorrow morning at 10 AM any and all offers by the defendants to buy or be bought out, or otherwise settle this case, will be withdrawn."  ECF No. 77, Declaration of Alan C. Trachtman ("Trachtman Decl."), Ex. 1.

Counsel then had a telephone conversation, and approximately one hour later, Mr. Trachtman sent another email message to Mr. Brickell:  "Jamie, This is to follow up on our telephone call a little while ago regarding settlement.  I would appreciate it if all future communications in this regard could be done in writing so we have a record of them."  That email

went on to say:

> I reiterate on behalf of my clients that our best and final offer is $5 million, which
> we will pay to buy out your clients from both restaurants or accept as payment to
> be bought out.  I confirm once again that the moment Milan is sworn in
> tomorrow morning at 10 AM any and all offers will be withdrawn.

*Id.*, Ex. 2.

Approximately 30 minutes later, at 5:34 p.m., Mr. Brickell replied:

> Alan, If your clients want to buy out my clients' interest in Ocinomled, it will take
> $9 million.  Please notify us if your clients accept our counter.  If your clients
> accept it, we will be available tomorrow to talk to you about the terms.  If you do
> not accept it, our clients accept your other offer and agree to buy out your clients'
> interests in both Delmonico's and Scaletta for $ 5 million.  Please let us know
> your client's response.

*Id.*, Ex. 3.

15 minutes later, Mr. Trachtman replied:  "On behalf of my clients we accept your offer to

buy us out for $5 million.  Accordingly, the deposition for tomorrow is canceled pending our

preparation of the settlement documents." *Id.*, Ex. 4.

Mr. Brickell responded approximately 15 minutes later, requesting a meeting to discuss

terms:  "We should meet at my office tomorrow at 10, since everyone was planning to be here

anyhow, and go through the terms.  Please confirm that you will be here." *Id.*, Ex. 5.  Mr.

Trachtman promptly replied at 6:30 p.m.:  "Actually, when we agreed to the settlement we all made

alternate plans for tomorrow.  In any event, we don't want to do this verbally.  Please send me

whatever terms you have in writing." *Id.*  In the last email exchanged on July 27, Mr. Brickell replied

at 7:35 p.m.:

> We will get you something in writing as quickly as we can.  In the meantime,
> please remind your clients that they are not to conduct any business out of the
> ordinary course, and they are not to remove any assets from or damage any assets
> of, Ocinomled or the Delmonico's restaurant.

*Id.*

On July 29, 2016, Mr. Brickell emailed Mr. Trachtman, attaching a non-binding letter of

intent.  ECF No. 80, Declaration of Jamie M. Brickell in Opposition to the Motion to Enforce

Settlement Agreement ("Brickell Decl."), Exs. F & G.  The letter of intent provided, in relevant part,

that the buy-out would be structured as an asset purchase; that the purchase price would be paid in

installments; that Plaintiffs would assume only those liabilities of Defendants that accrue after the

closing date and that relate to the contracts, leases, and other assets acquired in the purchase; and

that the buy-out would be conditioned on a due diligence investigation and a minimum of

$1,600,000 of working capital being left in the businesses.  *Id.*, Ex. F.

        Defendants did not sign the letter of intent.  Instead, Mr. Trachtman wrote to Mr. Brickell

on August 2, 2016, stating that "[t]he Defendants reject it."  *Id.*, Ex. G.  Mr. Trachtman explained:

> The Plaintiffs and Defendants have settled this case.  On July 26, 2016, there was
> an offer by the Plaintiffs to buy out Milan and Branko in Ocinomled Ltd. and
> 50/50 Restaurant Corp. and settle this case by the payment by the Plaintiffs of
> $5,000,000.00 and prompt acceptance of that offer by the Defendants.

*Id.*  Mr. Trachtman also described the "customary terms" that he believed the parties had already

implicitly agreed upon by way of their initial exchange of emails on July 27:

> The customary terms of settlement are that within a reasonable time, typically
> thirty days, the Plaintiffs will tender $5,000,000 to Milan and Branko and Branko
> and Milan would turn over to the Plaintiffs full ownership in Ocinomled and
> 50/50, all parties would sign general releases and the attorneys would execute and
> sign a stipulation of discontinuance, terminating this action.

*Id.*  Mr. Trachtman continued:

> Therefore, I propose that on or about August 25, 2016, the attorneys and parties
> convene at my office at 10 A.M., at which time; (1) Plaintiffs shall tender a
> certified check(s) in the amount of $5,000,000 made payable to Milan and Branko,
> (2) Milan and Branko shall convey full ownership of Ocinomled and 50/50 to
> Plaintiffs, (3) the corporations will distribute approximately $400,000.00 to each
> of the shareholders as and for retained earnings and return of their capital
> investment, (4) the parties shall execute full general releases and (5) the attorneys
> for the parties will sign a stipulation of discontinuance.

*Id.*

        Later that day, Mr. Brickell responded, stating:

> Alan, We both know that it is customary for parties to a litigation to enter into a

4

> settlement agreement that sets forth the terms of resolution when settling a case. When I wrote to you last Thursday and suggested that you and your clients come to my office the following day to discuss terms for a proposed deal, you declined, but acknowledged this to be the case, writing back:  "Please send me whatever terms you have in writing."  That is precisely what we did. . . .  At this point, it is clear that there is no meeting of the minds, and that you have no interest in negotiating the terms in good faith. . . .  We therefore demand that you make Defendant Milan Licul available for his deposition immediately."

*Id.*, Ex. H.

On August 5, 2016, Mr. Trachtman responded, explaining that he had not intended to invite Mr. Brickell to propose "brand new material provisions" that "change the very tenor of the agreed upon settlement," but that Mr. Brickell had done just that.  *Id.*, Ex. I.  Mr. Trachtman took issue with (1) the structure of the transaction as an asset purchase rather than a stock sale; (2) the limitation of liability to post-closing events; (3) payment of the purchase price in installments; (4) the requirement of $1,600,000 in working capital; and (5) the conditioning of the transaction on a due diligence investigation.  *Id.*

## II.   DISCUSSION[1]

"A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it."  *Oparah v. The New York City Dep't of Educ.*, No. 12-cv-8347(JGK), 2015 WL 4240733, at *4 (S.D.N.Y. July 10, 2015) (quoting *Meetings & Expositions Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974)).  The party seeking to enforce a purported settlement agreement bears the burden of proving that such a binding and enforceable agreement exists.  *E.g.*, *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 335 (S.D.N.Y. 2006).  "A settlement agreement is a contract that is interpreted according to general principles of contract

---

[1] The parties have not addressed whether the enforceability of the purported settlement agreement should be evaluated under New York law or federal common law.  The Court, however, is not required to decide this question, which has not been resolved by the Second Circuit.  *See Powell v. Omnicom*, 497 F.3d 124, 129 n.1 (2d Cir. 2007).  The principles of New York law and federal common law regarding the enforceability of settlement agreements are "materially indistinguishable," such that the Court may apply the two sets of laws "interchangeably."  *Id.*; *see also Barbarian Rugby Wear, Inc. v. PRL USA Holdings, Inc.*, No. 06-cv-2652(JGK), 2008 WL 5169495, at *2 n.1 (S.D.N.Y. Dec. 9, 2008) ("[T]here is no material difference between New York law and federal common law, with respect to the standards for contract formation.").

law." *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005).  As with any contract, a settlement agreement is binding only if there is an offer, acceptance, consideration, mutual assent, and intent to be bound.  *See, e.g.*, *Barbarian Rugby Wear*, 2008 WL 5169495, at \*2.

As a general matter, "parties are free to enter into a binding contract without memorializing their agreement in a fully executed document."  *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).  "However, if the parties intend not to be bound until the agreement is set forth in writing and signed, they will not be bound until then."  *Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 322 (2d Cir. 1997) (citing *Winston*, 777 F.2d at 80).  "To discern that intent a court must look to the words and deeds [of the parties] which constitute objective signs in a given set of circumstances."  *Winston*, 777 F.2d at 80 (alteration in original) (internal quotation marks and citation omitted).  In deciding whether parties intended to be bound in the absence of a formal written agreement, courts in this Circuit consider the following factors: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing."  *Id.*  These circumstances may be shown by "oral testimony or by correspondence or other preliminary or partially complete writings."  *Id.* at 81 (citing Restatement (Second) of Contracts § 27 comment c (1981)).

"But, despite any multi-factor inquiry, if the Court finds substantial ambiguity regarding whether both parties have mutually assented to all material terms, then the Court can neither find, nor enforce, a contract."  *Barbarian Rugby Wear*, 2008 WL 5169495, at \*3 (citing *Schurr v. Austin Galleries of Ill., Inc.*, 719 F.2d 571, 576 (2d Cir. 1983)).  Here, each of the *Winston* factors weighs against Defendants' argument that a binding settlement agreement was formed in this case.

### A.  Express Reservation of the Right Not to Be Bound

The first factor identified by the Second Circuit in *Winston*—whether there has been an

express reservation of the right not to be bound absent a writing—"is frequently the most important." *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005). Although this factor refers to "the right to be bound *absent a writing*," its application is not limited to circumstances in which the purported agreement is purely oral; rather, it applies with equal force where, as here, the parties have exchanged written correspondence that falls short of a formal and fully executed settlement document. *See Brown*, 420 F.3d at 154-55 (applying the factor to a written memorandum of understanding). Additionally, although this factor refers to "*express* reservation of the right not to be bound," the Court in *Winston* clarified that this factor is to be answered in the affirmative when language in the parties' correspondence "reveal[s] such an intent." *See Winston*, 777 F.2d at 81.

Here, an objective examination of the parties' correspondence reveals an intent not to be bound until a written settlement agreement was executed. Indeed, the first indicator of such an intent came from counsel for Defendants (Mr. Trachtman), who, in accepting Plaintiffs' buyout offer, wrote: "On behalf of my clients we accept your offer to buy us out for $5 million. Accordingly, the deposition for tomorrow is canceled *pending our preparation of the settlement documents*." Trachtman Decl., Ex. 4 (emphasis added). This statement suggests that Mr. Trachtman viewed the "preparation of the settlement documents" as a necessary step in the discontinuance of the action. Viewed through a slightly different lens, Mr. Trachtman's statement acknowledges that Plaintiffs would not be bound to permanently forego the deposition unless and until settlement documents were prepared.

Moreover, when counsel for Plaintiffs (Mr. Brickell) replied 15 minutes later requesting a meeting the next morning to "go through terms," *id.* Ex. 5, Mr. Trachtman responded that he was unavailable, adding: "In any event, we don't want to do this verbally. Please send me whatever terms you have in writing." *Id.* When Mr. Brickell sent his proposed terms in writing in the form of a letter of intent fewer than 48 hours later, Mr. Trachtman made clear that many of them were unacceptable and attempted to negotiate the terms. Brickell Decl., Ex. G. These facts suggest that

neither party intended to be bound until the kind of terms Mr. Trachtman requested, and Mr.

Brickell sent, were negotiated and memorialized in a formal writing, and this weighs against

enforcing the purported agreement.  *See Abel v. Town Sports Int'l Holdings, Inc.*, No. 09-cv-10388

(DLC), 2010 WL 5347055, at *5 (S.D.N.Y. Dec. 23, 2010) *(*"[T]he plaintiff's discussion of the need

for a formal settlement agreement . . . and the parties' subsequent negotiations regarding terms of

the agreement, approach an express reservation of the right not to be bound until a written

settlement agreement was executed.").

### B.  Partial Performance of the Contract

The second *Winston* factor asks whether "one party has partially performed, and that

performance has been accepted by the party disclaiming the existence of an agreement."  *Ciaramella*,

131 F.3d at 325.  "[P]artial performance is an unmistakable signal that one party believes there is a

contract; and the party who accepts performance signals, by that act, that it also understands a

contract to be in effect." *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75-76 (2d Cir. 1984).

No evidence of partial performance of the settlement agreement exists here.  Plaintiffs did not pay

any portion of the settlement consideration, nor did Defendants convey their interests in the

companies.  Neither party took contemporaneous steps to secure a dismissal of the action from the

Court.

Defendants argue that, by cancelling the deposition of Milan Licul, the parties partially

performed.  Defs.' Mem., ECF No. 78, at 8-9.  This argument misses the mark.  "To have partial

performance, there must be some actual performance of the contract, such that [the party asserting

the existence of the contract] conferred something of value upon [the party disclaiming existence of

the contract], which [the latter party] accepted."  *Nieves v. Cmty. Choice Health Plan of Westchester, Inc.*,

No. 08-cv-321(VB), 2011 WL 5531018, at *4 (S.D.N.Y. Nov. 14, 2011) (citing *Spencer Trask Software*

*& Info. Servs. LLC v. Rpost Int'l, Ltd.*, 383 F. Supp. 2d 428, 443-44 (S.D.N.Y. 2003)); *accord Gorodensky*

*v. Mitsubishi Pulp Sales (MC), Inc.*, 92 F. Supp. 2d 249, 256 (S.D.N.Y.), *aff'd*, 242 F.3d 365 (2d Cir.

2000) ("[P]artial performance of the contract must secure a benefit to the other party to be enforceable."). As an initial matter, Defendants can hardly be said to have conferred any benefit on Plaintiffs by cancelling Plaintiff's deposition of Defendant Milan Licul—a witness who Defendants themselves acknowledge Plaintiffs very much needed to depose. *See* Defs.' Mem. At 8 ("It is undisputable that the Grgurevs wanted to depose Milan Licul. In fact, the Grgurevs' need was so strong they requested permission from this Court to make a motion to compel Milan's deposition."). Moreover, the cancellation of the deposition was not an actual term of the purported settlement agreement; rather, it was a condition that Defendants placed on keeping their previously communicated settlement offer open.

Finally, cancellation of discovery activities is simply not the kind of "performance" that suffices to establish an intent to be bound, because it is just as consistent with an intent to *negotiate* a settlement as it is with an intent to be bound by an *already negotiated* settlement. *See, e.g.*, *Nieves*, 2011 WL 5331018, at *4 ("The fact that plaintiff ceased discovery during settlement negotiations does not affect this determination, as a party's decision not to resume active litigation during settlement discussions does not weigh for or against enforcing the contract." (internal quotation marks and citation omitted)); *cf. Alvarado v. Five Town Car Wash, Inc.*, No. 13-cv-1672(RJD), 2014 WL 252015, at *2 (E.D.N.Y. Jan. 22, 2014) (explaining that a lull in "active litigation" of a case and a promise to draft a written agreement are not sufficient to establish partial performance because they are "merely the natural consequences of pursuing an agreement to enter a written settlement agreement."). Here, Plaintiffs' acquiescence to the cancellation of the deposition more plausibly reflects a good-faith desire to engage in negotiation of a final settlement document. This reasoning applies with equal force to Plaintiffs' request that Defendants refrain from conducting any non-ordinary-course business and removing or destroying any of the companies' assets. Trachtman Decl., Ex. 5. Therefore, the second factor also weighs against enforcing the purported agreement.

### C.   Whether All of the Terms of the Alleged Contract Have Been Agreed Upon

As the court in *Winston* explained, the bottom-line inquiry under the third factor is whether there was "literally nothing left to negotiate" between the parties.  777 F.2d at 82.  That is hardly the case here.  Because "[t]he actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution," *Winston*, 777 F.2d at 82 (internal quotation marks omitted), "even 'minor' or 'technical' changes arising from negotiations over the written language of an agreement can weigh against a conclusion that the parties intended to be bound absent a formal writing."  *Powell*, 497 F.3d at 130.  "Such changes are relevant, however, only if they show that there were points remaining to be negotiated such that the parties would not wish to be bound until they synthesized a writing satisfactory to both sides in every respect."  *Id.* (internal quotation marks and citation omitted).  Accordingly, courts analyzing this factor focus on whether the parties reached agreement with respect to all *material* terms.  *See, e.g.*, *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007).  Here, this factor weighs strongly against finding an enforceable agreement, because the record establishes several material terms upon which the parties never agreed.  The Court will address some, but not all, of them in turn.

First, and most significantly, none of the initial emails exchanged on July 27, 2016 detailed— or even mentioned—the scope of release that would be provided upon consummation of the transaction with respect to the claims asserted in this case.  Furthermore, the record does not establish that the parties ever agreed upon whether the case would be dismissed with or without prejudice, whether that dismissal would include both claims and counterclaims, whether the parties would be released from claims that could have been but were not asserted in this case, or whether the parties would be released from future claims.  This alone is enough to preclude enforcement of the purported settlement agreement.  *See Benicorp*, 447 F. Supp. 2d at 337-40 (finding a purported settlement agreement unenforceable where there was no "meeting of the minds" on the scope of

10

release); *Cruz v. OneSource Facility Servs,, Inc.*, No. 3-cv-9233(LAP), 2005 WL 2923517, at *3 (S.D.N.Y. Nov. 4, 2005) ("[S]ettlement agreement is not complete where the parties cannot finalize general release language."); *Dittman v. Dyno Nobel, Inc.*, No. 97-cv-1724, 2000 WL 151950, at *3 (S.D.N.Y. Feb. 10, 2000) (finding that no contract existed where there was no "meeting of the minds" concerning the meaning of an exclusionary clause in a release).

In his August 2, 2016 email to Mr. Brickell, Mr. Trachtman stated that he believed a "general release[s]" was a "customary term[] of settlement." Brickell Decl., Ex. G, at 1. Defendants have not presented the Court with any evidence that a "general release" is a customary term. But even accepting that assertion, such a term would be insufficiently precise to render the purported agreement enforceable. *See, e.g.*, *Benicorp*, 447 F. Supp. 2d at 337-40 (finding the third *Winston* factor weighed against enforceability because the term "general release" could have been construed to cover only existing claims or also future claims). Defendant also argues that "[s]ettling the case has the ordinary meaning of a complete resolution of the case." ECF No. 82, Reply Memorandum of Law in Support of Defendants' Motion to Enforce Settlement Agreement, at 2. This argument fares no better. Even if the parties had agreed to "a complete resolution of the case," that would not fully address the scope of release. As already noted, both parties could intend to "completely resolve this case," while only one party intends to include a release from future claims.

Second, the parties did not agree upon the structure of the transaction. While Defendants contemplated a stock purchase, Brickell Decl., Ex. I, at 1, this was not specified in explicit terms in the initial exchange of emails. Defendants contend that Plaintiff's offer to "buy out your clients' interests," Trachtman Decl., Ex. 3, unambiguously referred to a stock sale, but they provide no authority for the contention that this language could not be understood to refer to a purchase of their property interests in the companies. Furthermore, the record shows that this term was material to Defendants. In the letter of intent, Plaintiffs proposed that the transaction be effectuated as an asset purchase and that Plaintiffs would only assume post-closing liabilities relating to the contracts,

leases, and other assets acquired in the purchase. *Id.*, Ex. F ¶¶ 1, 3.  Defendants made clear that they did not assent, explaining in an August 5, 2016 letter:

> The proposed asset sale causes a ridiculous situation.  Instead of a business divorce which we all want, an asset sale creates, *inter alia*, too many loose ends and unintended consequences.  Even if we were to agree to an asset sale, if your clients' new company is not assuming pre-closing liabilities, who is?"

*Id.*, Ex. I, at 1-2.

Third, the parties did not agree on the disposition of the $1.6 million of cash reserves in the companies.  The initial exchange of emails on July 27, 2016 made no mention of the reserves.  The notion that it would be distributed it to each of the four shareholders as part of the transaction first arose in Defendants' August 5, 2016 letter, in which they rejected Plaintiffs' letter of intent.  Brickell Decl., Ex. G, at 1.  As Plaintiffs explained in their opposition brief, it is quite reasonable to infer that they would not have tacitly agreed to this term because it effectively alters the purchase price.  *See* ECF No. 79, Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Enforce Settlement Agreement, at 13 ("It is a matter of logic that Plaintiffs would not have offered the same price for a company with $1.6 million less in cash assets as it would for a company with that cash in reserve.").

Fourth, the parties' communications did not specify the disposition of the intellectual property rights associated with the companies.  This was particularly material here, where the underlying suit in significant part concerns allegations of trademark infringement.

The fact that these terms concerning transactional mechanics were left open is sufficient to preclude a finding that the parties intended to be bound.  *See, e.g.*, *Adjustrite Sys., Inc. v. GAB Bus. Servs.*, 145 F.3d 543 (2d Cir. 1998) (finding an agreement unenforceable where it provided "no details concerning the contemplated transfer" of a license or whether a software purchase would include "collateral rights, such as the copyrights to the software").

In sum, the Court finds that the parties did not agree to all material terms.  In so concluding,

the Court is guided by the traditional principle that a contract is not binding unless its terms are sufficiently certain and definite. *See, e.g.*, *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 939 (2d Cir. 1998) (quoting Williston on Contracts § 4:18, at 414 (4th ed. 1990)) ("It is a necessary requirement that an agreement, in order to be binding, must be sufficiently definite to enable the courts to give it an exact meaning."); *see also* Restatement (Second) of Contracts § 33(2) (1981) ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."). Here, were the Court to find this agreement enforceable, and were one of the parties later to allege a breach of the agreement, the open terms described above would leave the Court unable to adjudicate that dispute. As a result, the third *Winston* factor weighs strongly against enforcing the purported agreement.

### D.  The Type of Contract That Is Usually Committed to Writing

"Settlements of any claim are generally required to be in writing or, at a minimum, made on the record in open court." *Ciaramella*, 131 F.3d at 326. Here, of course, the parties have not executed a formal writing, nor have they read the terms of an agreement into the record in open court. However, "[s]ince the *Winston* test is designed to determine if a settlement agreement is binding absent a formally executed agreement, it would be a strange test if the fourth factor always favored finding no agreement on the ground that settlement agreements usually are written." *Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*, No 4-cv-1621 (KMW), 2005 WL 1377853, at *9 (S.D.N.Y. June 9, 2005). In analyzing whether the parties intended that a particular settlement agreement be reduced to a writing, therefore, "the correct question is whether the settlement agreement terms are sufficiently complex or involve long time periods, such that there should be a formal writing." *Id.* (citing *Adjustrite*, 145 F.3d at 551). Courts evaluate complexity by considering "(1) the amount of money at issue, (2) whether the terms of agreement will carry into perpetuity, and (3) the length and complexity of the agreement itself." *Conway v. Brooklyn Union Gas Co.*, 236 F. Supp. 2d 241, 251 (S.D.N.Y. 2002) (citing *Winston*, 777 F.2d at 83); *accord Cedric Kushner*

*Promotions, Ltd. v. King*, No 98-cv-6859(WHP), 1999 WL 13732, at *2 (S.D.N.Y. Jan. 11, 1999) ("The final factor is whether the agreement at issue is the type of instrument that is usually committed to a writing.  For these purposes, courts have considered both the amount of money at stake as well as the magnitude and complexity of the deal." (citation omitted)).

Here, the parties' contemplated agreement was relatively complex.  First, it involved $5 million—a significant amount of money by any measure.  Second, it involved terms that will carry into the future, including the potential payment of consideration over a period of time, as well as the disposition of trademark and other intellectual property rights.  Finally, the transaction involves the disposition of substantial assets of two companies, as well as considerations of post-closing assumption of liability.  Moreover, parties who purchase companies—particularly with brand recognition such as that enjoyed by Delmonico's—ordinarily require sophisticated contractual provisions such as representations and warranties.

In *Winston*, the Court found that an agreement calling for the payment of a mere $62,500 to be made over several years based upon a percentage of earnings was sufficiently complex as to be the type of agreement that is usually committed to writing.  777 F.2d at 78-79, 83.  The agreement at issue here is substantially more complex than that.  As a result, the Court concludes that the fourth factor weighs against enforcing the purported settlement agreement.  *See, e.g.*, *Adjustrite*, 145 F.3d at 551 (finding the fourth factor to weigh against enforceability because, "[i]n view of the size of the transaction, the nature of the assets being purchased, and the length of the contemplated employment contracts, the Agreement clearly was of the type that ordinarily would be committed not only to a writing but to a formal contract complete with representations and warranties and the other standard provisions usually found in sophisticated, formal contracts").

## III.   CONCLUSION

In sum, each of the factors described by the Second Circuit in *Winston* counsels against finding that the parties reached a binding and enforceable agreement to settle this case.  Accordingly,

14

Defendants' motion to enforce the purported settlement agreement is DENIED.  The Clerk of Court is directed to terminate the motion pending at Dkt. No. 71.

      SO ORDERED.

Dated:  November 9, 2016
New York, New York

                             GREGORY H. WOODS
                         United States District Judge