UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/26/2017
```

-------------------------------------------------------------X

FERDO GRGUREV and OMER GRGUREV,     :
individually and derivatively,                        :
                                                                  :
                                            Plaintiffs,  :
                                                                  :
                    -against-                          :
                                                                  :
MILAN LICUL, BRANCO TURCINOVIC,     :
DENNIS TURCINOVIC, FIVE "M" CORP., 268  :
SH RESTAURANT CORP., DELMONICO'S     :
DISTRIBUTION LLC, and 268 SH              :
RESTAURANT CORP.,                             :
                                                                  :
                                          Defendants,  :
                    -and-                               :
                                                                  :
OCINOMLED LTD. and 50/50 RESTAURANT  :
CORP.,                                                :
                                                                  :
                           Nominal Defendants.  :

-------------------------------------------------------------X

                    1:15-cv-9805-GHW

              MEMORANDUM OPINION
                    AND ORDER

GREGORY H. WOODS, United States District Judge:

        Plaintiffs Omer and Ferdo Grgurev and Defendants Milan Licul and Branko Turcinovic are

experienced restaurateurs who have owned and operated restaurants together for many years.

Unfortunately, the relationship between them has now gone to pot, devolving into this acrid stew

which, after long simmering, has now come to a boil.  The amended complaint asserts a

smorgasbord of fourteen derivative and direct claims ranging from trademark infringement to

tortious interference.  Defendants have asserted five counterclaims, including a petition for

dissolution of one of the corporations that they co-own with Plaintiffs.  In addition, all parties have

informed the Court of their intention to bring cross-motions for sanctions, and Plaintiffs have

recently moved for a preliminary injunction barring Defendants from making any repairs,

renovations, or improvements to one of their jointly owned restaurants while this action is pending.

Now before the Court, however, is Defendants' motion to realign the parties and to dismiss twelve

of Plaintiffs' claims.  For the reasons that follow, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

## I.   BACKGROUND[1]

### A.   The Relationship Between the Parties

Plaintiffs Omer and Ferdo Grgurev and Defendants Milan Licul and Branko Turcinovic (the "Co-Owner Defendants," and collectively with Plaintiffs, the "Co-Owner Parties") are equal co-owners of Nominal Defendants Ocinomled Ltd. ("Ocinomled") and 50/50 Restaurant Corporation ("50/50").  ECF No. 26, Am. Compl. ("AC"), ¶¶ 16-19.  Because they each hold a 25% ownership stake, the Plaintiffs together and the Co-Owner Defendants together each represent half of the voting power of each these entities.

The Co-Owner Parties formed Ocinomled "in or around 1998" for the purpose of purchasing Delmonico's, a restaurant located at 56 Beaver Street in Manhattan.[2]  AC ¶ 16. Ocinomled is a closely held corporation and does not have a governing operating agreement or shareholders' agreement.  AC ¶ 18, 97.

Prior to forming Ocinomled, the Co-Owner Parties had partnered together for many years in the operation of other restaurants, including Scaletta.  AC ¶ 19.  Scaletta is located at 50 West 77th Street in Manhattan and is operated through Nominal Defendant 50/50.  *Id.*  The Co-Owner Defendants have owned other restaurants separate and apart from those that they own with Plaintiffs, including Murano and Arno, the latter of which they own and operate through Balarini Restaurant Corporation.  AC ¶ 20.

According to the amended complaint, Defendant Milan Licul was, "at all relevant times,"

---

[1] Unless otherwise noted, the facts are taken from the amended complaint, and are accepted as true for the purposes of this motion.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] As Plaintiffs point out in the amended complaint, "Ocinomled" is "Delmonico" spelled backwards.  AC at 2 n.1.

responsible for maintaining the financial books and records of both Delmonico's (through Ocinomled) and Scaletta (through 50/50). AC ¶ 21, 122. Licul engaged the same accountant to maintain the books for both restaurants. AC ¶ 123. Licul was also the president of 50/50. AC ¶ 193.

### B. Delmonico's and the DELMONICO'S Marks

Delmonico's has been described by the New York Times as "possibly the most famous name in American restaurant history." AC ¶ 27, Ex. A. "In operating and promoting its restaurant, Ocinomled maintains the classic and upscale ambience for which Delmonico's is famous, and its menu includes classic Delmonico's dishes, such as Lobster Newburg, Oysters Rockefeller, Baked Alaska, Eggs Benedict, Chicken a la Keene and, of course, Delmonico's Steak." AC ¶ 23. According to Plaintiffs, the "high-end reputation of the restaurant is inextricably tied to the DELMONICO'S name." *Id.* Plaintiffs allege that Delmonico's "has been extremely profitable for the last fifteen years" and has averaged annual net revenues of at least $5 million for the past several years. AC ¶¶ 29-30.

In acquiring the Delmonico's restaurant, Ocinomled also acquired the right to use the "Delmonico's" name, as well as "all other rights" to that name held by the seller, CIBE Beaver LLC. AC ¶ 17. In 2004, Ocinomled filed an application with the U.S. Patent and Trademark Office (the "USPTO") for registration of the DELMONICO'S service mark in Class 43 for Restaurant Services (the "Restaurant Mark"). AC ¶ 24. That application is assigned U.S. Serial Number 76577253. *Id.* In 2007, Ocinomled filed an application with the USPTO for registration of the DELMONICO'S trademark and service marks for various products and services covered by Classes 8, 16, 18, 21, 25, 29, 30, 34, and 41, including cutlery, cookbooks, bags and briefcases, dinnerware, clothing, prepared foods, salad dressings and sauces, cigars and cigar accessories, and entertainment services (the "Product Mark," and collectively with the Restaurant Mark, the "Marks"). AC ¶ 25. That application is assigned U.S. Serial Number 77301695. *Id.*

Both of Ocinomled's registration applications are "suspended in accordance with USPTO procedure pending resolution of a concurrent use registration application made by an unrelated party in connection with its operation of an unrelated restaurant using the Delmonico's name in or around Albany, New York."  AC ¶ 26.

Plaintiffs alleges that the Marks "are famous and are an iconic symbol of a fine dining steakhouse."  AC ¶ 27.  They also allege that the Marks "invoke the goodwill associated with the historical roots of the Delmonico's restaurant."  *Id.*

### C.  The Operation of Delmonico's and Scaletta

After the Co-Owner Parties purchased Delmonico's through Ocinomled, they closed the restaurant for refurbishment and reopened it in mid-May 1998.[3]  AC ¶ 22.  They "jointly decided that none of them would be directly involved in the day-to-day operations of the restaurant."  AC ¶ 31.  The Co-Owner Defendants devoted their time to managing their other restaurants, Murano and Arno, while Plaintiffs continued managing the day-to-day operations of Scaletta.  *Id.*

The Co-Owner Defendants appointed Defendant Dennis Turcinovic—Defendant Branko Turcinovic's son—as one of two co-managers of Delmonico's.  AC ¶ 32.  As co-manager, he had regular access to the cash received during the course of Delmonico's daily operations.  AC ¶ 103.

Defendant Milan Licul "conducts the bookkeeping" for Delmonico's and "maintains the financial books and records of Delmonico's at the offices of Arno," the restaurant jointly owned by the Co-Owner Defendants.  AC ¶ 33.  Plaintiffs allege that Defendants Milan Licul and Dennis Turcinovic "were and are responsible for collecting all cash receipts from Delmonico's restaurant."  AC ¶ 34.

Defendant Milan Licul also is responsible for maintaining the books and records for the

---

[3] The Court observes that Plaintiffs have attached to their amended complaint an article from The New York Times entitled *A New Delmonico's*.  AC, Ex. A.  That article, dated May 13, 1998, refers to the re-opening and describes Robert Ruggeri and Stefano Frittella as "[t]he new owners . . . who run the Bice restaurant group."  *Id.*

other restaurants jointly owned by the Co-Owner Parties, including Scaletta.  AC ¶ 96.

The Co-Owner parties received regular salaries from Ocinomled, which "were determined by Defendant Milan [Licul] and paid out through the company's payroll."  AC ¶ 35.  Initially, Plaintiffs were paid $500 per week, but their salaries were subsequently raised to $1,500 per week. AC ¶ 36.  Defendant Branko Turcinovic was also paid $1,500 per week, while Defendant Milan Licul paid himself $2,000 per week.  *Id.*

### D.  Defendants' Alleged Unauthorized Exploitation of the Marks

Plaintiffs allege that, based on the success of Delmonico's restaurant, the Co-Owner Defendants "saw an opportunity to capitalize on the DELMONICO'S marks."  AC ¶ 39.  "[R]ather than expanding the brand for the benefit of Ocinomled," however, the Co-Owner Defendants "elected to pursue opportunities for their own benefit, to the detriment of Ocinomled" by using the Marks in connection with various sauces and other restaurants.  AC ¶ 40; *id.* ¶¶ 40-90.

### 1.  The Sauces and Delmonico's Distribution LLC

According to the amended complaint, the Co-Owner Defendants "undertook to manufacture, distribute and sell products under the DELMONICO'S Product Mark, including Delmonico's steak sauce . . . as well as other sauces, salad dressings and marinades."  AC ¶ 41.  The Co-Owner Defendants presented Plaintiffs with the idea of developing and marketing a steak sauce under the DELMONICO'S Product Mark.  AC ¶ 42.  Based upon a representation that royalties would be paid to Ocinomled for that use of the Product Mark, Plaintiffs did not object to the idea. AC ¶¶ 43-44.  Thereafter, the Co-Owner Defendants began manufacturing, distributing, and selling steak sauce under the DELMONICO'S Product Mark, but Ocinomled has not received any royalties or other compensation.  AC ¶ 44-45.

In addition to the use of the Product Mark in connection with the steak sauce, Plaintiffs allege that the Co-Owner Defendants "unilaterally decided to use the DELMONICO'S Product Mark for pasta sauces, salad dressings and marinades."  AC ¶ 47.  They did not inform Plaintiffs of

their plan to do so, nor did they obtain a license or consent from Ocinomled for the use of the Product Mark in connection with those products.  AC ¶ 48-49.

The Co-Owner Defendants formed Defendant Delmonico's Distribution LLC ("Delmonico's Distribution") for the purpose of manufacturing, distributing, and selling these sauces, and Plaintiffs allege that Delmonico's Distribution "is currently selling these products nationwide online and in stores" at the direction of the Co-Owner Defendants.  AC ¶¶ 51-52. Neither Delmonico's Distribution nor the Co-Owner Defendants have reported their earnings from the manufacture, distribution, and sale of these products to Ocinomled or to Plaintiffs.  AC ¶ 53. They also have not paid any license fees or royalties.  AC ¶ 54.

### 2.  The Unauthorized Restaurants:  Delmonico's Kitchen and Delmonico's of Southampton

According to the amended complaint, the Co-Owner Defendants also used the DELMONICO'S name on other restaurants, including Delmonico's Kitchen and Delmonico's of Southampton, which are owned by corporations that the Co-Owner Defendants alone own and control.  AC ¶ 59-90.  Neither Plaintiffs nor Nominal Defendants Ocinomled and 50/50 have any ownership stake in or affiliation with either of these restaurants.  AC ¶¶ 62, 77.

Through Defendant Five "M" Corporation ("Five M"), an entity which they own and control, the Co-Owner Defendants converted Murano into Delmonico's Kitchen, which is located at 207 West 36th Street in Manhattan.  AC ¶¶ 60-61.  The website of Delmonico's Kitchen states that "Delmonico's, the country's first fine dining restaurant, has expanded its premier location at 56 Beaver Street to Midtown Manhattan" and references 1837—the year in which the original Delmonico's restaurant is believed to have opened.  AC ¶ 69 & Ex. B.  Neither the Co-Owner Defendants nor Five M obtained permission from Plaintiffs to use the DELMONICO'S name in connection with that restaurant, nor did they obtain a license or other form of consent from Ocinomled.  AC ¶ 64.  As with the Product Mark, Plaintiffs allege that neither the Co-Owner

Defendants nor Five M have reported the revenues earned from Delmonico's Kitchen to Ocinomled, and they have not paid any licensing fees or royalties to Ocinomled for their use of the Restaurant Mark.  AC ¶ 65-66.

Plaintiffs allege that the use of the Restaurant Mark in connection with Delmonico's Kitchen has caused customers to confuse that restaurant with Ocinomled's restaurant, as evidenced by "several consumer reviews on public websites such as Yelp" that "reflect that consumers believe that Delmonico's Kitchen is affiliated with Ocinomled's famous Delmonico's restaurant."  AC ¶ 71.

Through 268 SH Restaurant Corporation ("SH"), another entity that they own and control, the Co-Owner Defendants opened a restaurant by the name of Delmonico's of Southampton in 2013.  AC ¶ 75.  As with Delmonico's Kitchen, the amended complaint alleges that neither the Co-Owner Defendants nor SH received permission from Plaintiffs or Ocinomled to use the DELMONICO'S name in connection with Delmonico's of Southampton, nor did they obtain a license or other form of consent for that use of the Restaurant Mark.  AC ¶ 79.  Neither Plaintiffs nor Ocinomled have received any report of the revenues earned from Delmonico's of Southampton, and no license fees or royalties have been paid to Ocinomled for the use of the Restaurant Mark in connection with Delmonico's of Southampton.  AC ¶ 80-81.

According to the amended complaint, the Co-Owner Defendants and SH "encouraged customer confusion by mischaracterizing Delmonico's of Southampton as an 'offshoot' of the Delmonico's flagship New York City location, promoting the false assumption of a connection between Ocinomled's restaurant and [Delmonico's of Southampton]."[4]  AC ¶ 83.  Several customers have "confused Delmonico's of Southampton as being affiliated with Ocinomled's restaurant."  AC ¶ 85.  For example, "several publicly available reviews reflect that consumers believed that

---

[4] The amended complaint actually states "between Ocinomled's restaurant and Delmonico's Restaurant."  AC ¶ 83.  The Court assumes this to be an error, since Delmonico's is Ocinomled's restaurant.  *See* AC ¶ 16, 23.

Delmonico's of Southampton was another location of Ocinomled's famous Delmonico's restaurant." *Id.*

### 3. The Cease-and-Desist Letter and the Co-Owner Defendants' Response

On November 12, 2013, Plaintiffs, through counsel, served a cease-and-desist letter upon the Co-Owner Defendants. AC ¶ 91 & Ex. C. The letter advised the Co-Owner Defendants that their use of the DELMONICO'S Restaurant Mark in connection with Delmonico's Kitchen and Delmonico's of Southampton was improper and unauthorized and, because it was a usurpation of the name for their own benefit, it was a breach of their "fiduciary obligation as shareholders of Ocinomled Ltd." AC ¶ 91 & Ex. C, at 1. The letter also demanded that the Co-Owner Defendants immediately cease their use of the name in connection with the "unaffiliated restaurants." AC, ¶ 92 & Ex. C, at 2.[5]

Despite receiving this letter, the Co-Owner Defendants and Defendants Five M and SH "continued to willfully use the DELMONICO'S name without authorization in connection with their unaffiliated restaurants." AC ¶ 93. Plaintiffs allege that Defendants' continued "misuse of the Restaurant Mark caused substantial damage to Ocinomled." AC ¶ 94.

### E. Other Alleged Wrongful Conduct

#### 1. Alleged Misappropriation of Funds

Plaintiffs also allege that Defendants "misappropriated funds and resources that rightfully belonged to Ocinomled and the Plaintiffs." AC ¶ 95. Specifically, they allege that the Co-Owner Defendants and Defendant SH have "used funds received at Delmonico's—which belonged to Ocinomled—to purchase the building that housed Delmonico's of Southampton, through another entity controlled by Defendant Milan [Licul], Defendant [268] SH Realty [Corporation ("SH Realty")], and to establish that restaurant." AC ¶ 99. They also allege that the Co-Owner

---

[5] The letter does not mention the Co-Owner Defendants' alleged use of the DELMONICO'S Product Mark in connection with sauces or any other product.

Defendants and SH "may have" put up Ocinomled's Delmonico's restaurant as collateral, without authorization, for the loan they took to develop Delmonico's of Southampton.  AC ¶ 100.

Similarly, Plaintiffs allege that the Co-Owner Defendants and Defendant Five M used Delmonico's funds to "refurbish and reinvent Murano restaurant into Delmonico's Kitchen."  AC ¶ 101.  This project cost "approximately $600,000, at least a portion of which was paid for with Ocinomled's funds."  *Id.*  The Co-Owner Defendants also "repeatedly used Delmonico's chefs and waiters at Delmonico's of Southampton and Delmonico's Kitchen but, upon information and belief, paid these employees from Ocinomled's payroll, despite Ocinomled having no interest in these other two restaurants."  AC ¶ 108.

Plaintiffs further allege that the Co-Owner Defendants and Defendant Delmonico's Distribution used Ocinomled's funds to finance the creation, marketing, and distribution of the various sauces, salad dressings, and marinades described above.  AC ¶ 102.

According to the amended complaint, Defendant Milan Licul manipulated Ocinomled's general ledger to conceal Delmonico's actual cash receipts "in order to aid the transfer of cash receipts to Five M, SH Realty, SH Restaurant, Delmonico's Distribution, and Balarini Restaurant Corp., all to be applied to infringing products and restaurants."  AC ¶ 105.

Defendant Dennis Turcinovic "provided a portion of that cash to Defendant Milan [Licul] to be used for these improper purposes," and Defendant Branko Turcinovic "was aware of this regular 'siphoning' of cash to Defendant Milan [Licul], and assisted in those improper transactions."  AC ¶ 103-104.

### 2.  2015 Salary Changes

In April 2015—the same time period during which the Co-Owner Defendants were allegedly siphoning funds from Ocinomled to benefit their other ventures—they also "unilaterally elected to cut off Plaintiffs['] . . . compensation, without explanation."  AC ¶ 37, 106.  At the same time, Plaintiffs allege, Defendant Milan Licul doubled Defendant Branko Turcinovic's compensation to

$3,000 per week and increased his own compensation to $3,500 per week.  AC ¶ 38.

### 3.  Alleged Misuse of FEMA Funds

Ocinomled's Delmonico's restaurant sustained approximately $3 million of flooding damage

from Hurricane Sandy in 2012.  AC ¶ 112-113.  The Co-Owner parties jointly decided to file a claim

with the Federal Emergency Management Agency ("FEMA") for those losses.  AC ¶ 114.

Approximately two years later, Plaintiffs requested information concerning the status of the FEMA

claim, and Defendant Milan Licul informed them that no money had ever been paid on the claim.

AC ¶ 115.  "Upon further inquiry, however, Plaintiffs learned from Ocinomled's accountant that

this statement by Defendant Milan [Licul] was false, and that FEMA had in fact paid some funds" to

Ocinomled.  AC ¶ 116.  Accordingly, Plaintiffs allege that Defendant Milan Licul "misappropriated

the FEMA funds that had been paid to Ocinomled and used them for his own benefit and for the

benefit of Defendants SH Restaurant, SH Realty and Five M."  AC ¶ 117.

### 4.  Alleged Interference with the Renewal of Scaletta's Lease

According to the amended complaint, Defendant Milan Licul's "misconduct was not just

limited to Delmonico's."  AC ¶ 119.  Since 50/50 opened Scaletta in 1988, it has operated in a leased

space on the Upper West Side of Manhattan.  AC ¶ 124.  As of the time the amended complaint was

filed on February 22, 2016, the Scaletta lease was set to expire at the end of March 2016.  AC ¶ 125.

Plaintiffs allege that Defendant Milan Licul, on behalf of 50/50, "unilaterally took control of

negotiations with the landlord to renew the current lease" and "notified Plaintiffs . . . that he . . . was

the only person with authority to negotiate a new lease for the restaurant."  AC ¶ 126.  As of the

date the amended complaint was filed, 50/50 had been unable to reach terms on a renewal of the

lease with the landlord.  AC ¶ 127.

Plaintiffs allege that Mr. Licul is "acting solely out of malice" by "intentionally stalling

negotiations and purposely refusing to reach terms on 50/50's lease renewal" "in order to punish

[Plaintiffs] for disputing [his] misconduct with respect to Ocinomled, and to pressure [Plaintiffs] not

to assert claims with regard to his other wrongdoing." AC ¶¶ 128-130. This conduct, Plaintiffs allege, is "risking the future of Scaletta restaurant." AC ¶ 131.

### F. Demand Futility Allegations[6]

Plaintiffs have made no demand on Ocinomled aside from the letter demanding that the Co-Owner Defendants cease and desist from using the DELMONICO'S Marks in connection with their unaffiliated restaurants. AC ¶ 132-134. Instead, Plaintiffs allege that a litigation demand would be futile for several reasons: First, the Co-Owner Defendants "were and are the primary actors behind all of the wrongful conduct" alleged in the amended complaint "and face a substantial likelihood of being held liable for . . . breaching their fiduciary duties . . , and are therefore incapable of disinterestedly considering a demand to vigorously prosecute this action against themselves." AC ¶ 134(a). Second, as 50% shareholders in the Nominal Defendants, the Co-Owner Defendants could "prevent any action taken on behalf of the Nominal Defendants to remedy the actions taken against it." AC ¶ 134(b). Third, "[t]he actions taken by Defendants are so egregious on their face that they could not have been the product of sound business judgment." AC ¶ 134(d).

### G. Procedural History

Plaintiffs initiated this lawsuit on December 16, 2015. In the original complaint, the Grgurevs joined Ocinomled and 50/50 as plaintiffs. ECF No. 1, Compl., at 1. They brought federal trademark claims as well as various state law claims. Compl. ¶¶ 132-191. On February 5, 2016, Defendants answered the complaint and asserted counterclaims for breach of the duties of care and loyalty owed to 50/50, conversion, and unjust enrichment. ECF No. 18. Defendants also petitioned for dissolution of 50/50. *Id.*

On February 29, 2016, Plaintiffs amended their complaint to replead certain of their claims

---

[6] New York law requires that the complaint in a shareholder's derivative action "set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort." N.Y. Bus. Corp. Law § 626(c). Fed. R. Civ. P. 23.1(b)(3) imposes a similar requirement. Defendants do not seek to dismiss any of the claims here on the ground that Plaintiffs failed to make a demand, nor do they challenge Plaintiffs' demand-futility allegations.

as derivative and to rename Ocinomled and 50/50 as nominal defendants.  ECF No. 26, AC.  The amended complaint asserts ten derivative claims and four direct claims, including claims for federal trademark infringement and dilution, as well as state law claims for breach of fiduciary duty, breach of the duty of loyalty, conversion, unjust enrichment, deceptive trade practices, and tortious interference with business relationship.  AC ¶¶ 137-220.  Plaintiffs also assert an equitable claim for an accounting.  AC ¶¶ 170-174.  As relief, Plaintiffs seek a permanent injunction barring Defendants from using the Marks in connection with the unauthorized restaurants and products, as well as compensatory and punitive damages.  AC at 33-34.[7]

On March 29, 2016, Defendants moved to dismiss twelve of the fourteen claims asserted in the amended complaint.  ECF No. 38, Mot. to Dismiss; ECF No. 40, Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Mem."); ECF No. 39, Decl. of Alan C. Trachtman ("Trachtman Decl.").  The only claims they do not move to dismiss are the federal claims for false designation of origin pursuant to 15 U.S.C. § 1125(a) and trademark dilution pursuant to 15 U.S.C. § 1125(c).  *See* Defs.' Mem.  In addition, Defendants request in their motion that the Court re-align the parties to recast the Nominal Defendants as plaintiffs.  Defs.' Mem. at 2-3.  Plaintiffs filed an opposition brief on April 22, 2016.  ECF No. 45, Mem. of Law in Opp'n to Mot. to Dismiss ("Pls.' Mem."); ECF No. 46, Decl. of Jamie M. Brickell ("Brickell Decl.").  Defendants filed a reply brief on April 28, 2016.  ECF No. 47, Reply Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Reply Mem."); ECF No. 48, Reply Decl. of Alan C. Trachtman ("Trachtman Reply Decl.").[8, 9]

---

[7] Plaintiffs did not verify their amended complaint, as they were required to do in accordance with Fed. R. Civ. P. 23.1, when they repleaded certain claims as derivative.  The parties stipulated that Plaintiffs could file Rule 23.1 verifications as separate filings in lieu of amending the complaint for a second time.  *See* ECF No. 34.  On March 18, 2016, the Grgurevs each filed a verification on the docket.  ECF Nos. 32-33.

[8] On July 21, 2016, the parties stipulated to the dismissal of the direct claims as against Defendant Dennis Turcinovic. ECF No. 58.  The only claims that remain against him are claims four, five, six, eight, and nine.

[9] On September 26, 2016, Defendants filed a separate motion to dismiss the case based upon a purported settlement agreement.  ECF No. 71.  The Court denied that motion on November 10, 2016, finding that no binding settlement agreement had been reached between the parties.  ECF No. 87.

## II.   DEFENDANTS' MOTION FOR REALIGNMENT OF THE PARTIES

In their opening brief, Defendants contend that Plaintiffs have "[i]mproperly [r]ealigned the [p]arties" and ask the Court to "[o]rder Plaintiffs' Amended Complaint be amended to include Ocinomled and 50/50 as Plaintiffs in the caption, their proper title, and not as 'Nominal Defendants.'"  Defs.' Mem. at 2-3.  At the outset, the Court notes that realignment of parties is relevant only to the issue of whether there is complete diversity of citizenship.  Here, however, the Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331, grounded on Plaintiffs' three federal trademark claims.  Since Defendants move to dismiss only one of those three federal claims, subject matter jurisdiction is not at issue, and it is unclear why Defendants feel compelled to seek realignment.  Nevertheless, the Court has considered Defendants' request, and it will be granted.

"The general rule is that the corporation in a derivative suit should be aligned as a plaintiff since it is the real party in interest."  *Obstfeld v. Schwartz*, 621 F. Supp. 2d 87, 93 (S.D.N.Y. 2008) (quoting *ZB Holdings, Inc. v. White*, 144 F.R.D. 42, 45 (S.D.N.Y. 1992)).  An exception to this rule exists, however, for those situations in which aligning the corporation as a plaintiff would not provide a "real collision of interests."  *See id.* (citing *Smith v. Sperling*, 364 U.S. 91, 97 (1957)); *see also Lewis v. Odell*, 503 F.2d 445, 447 (2d Cir. 1974) ("As a general rule the federal courts are required to realign parties according to their real interests so as to produce an actual collision of interests.").  Aligning a corporation as a defendant is "only proper when [the] corporation is actively antagonistic to plaintiff's interests."  *Obstfeld*, 621 F. Supp. 2d at 93-94 (quoting *ZB Holdings*, 144 F.R.D. at 45).

"[A]ntagonism has generally not been found where the corporation does not, would not, or cannot express opposition to the initiation of the lawsuit."  *Id.* at 94 (quoting *Netwolves Corp. v. Sullivan*, No. 00-cv-8943 (AGS), 2001 WL 492463, at *6 (S.D.N.Y. May 9, 2001)); *see also Netwolves*, 2001 WL 492463, at *7 ("[A] corporation that cannot act, a deadlocked corporation, is not considered 'actively antagonistic' to a lawsuit, within the meaning of *Sperling* and *Swanson*, because the corporation has not refused to sue, and will not clearly refuse to sue if it becomes able to render

a decision."); *Cohen v. Heussinger*, No. 89-cv-6941, 1994 WL 240378, at *2 (S.D.N.Y. May 26, 1994) (Sotomayor, J.) (holding that case did not "fall within the boundaries of" the *Sperling* exception "because [Plaintiff] and [Defendant] were co-equal owners of [the corporation], and the Proposed Complaint does not allege that [Defendant] controlled the corporation."); *Sonn, on Behalf of WLS Assocs. v. Korein*, No. 88-cv-1014, 1988 WL 100221, at *1 (S.D.N.Y. Sept. 21, 1988) ("Where an entity such as [a] corporation or a partnership has 'retained neutrality' in respect of a plaintiff's derivative claims, there is lacking that degree of antagonism to align the entity as a party defendant." (citing *Lewis*, 503 F.2d at 447)); *Kartub v. Optical Fashions, Inc.*, 158 F. Supp. 757, 758-59 (S.D.N.Y. 1958) ("While [the corporation] is disabled from acting in its own interest, for the purpose of the alignment of parties it cannot be considered to be adverse to the plaintiff.").

Here, it is quite clear that neither Ocinomled nor 50/50 would initiate this litigation. The reason, however, is not that a majority of its shareholders have voted, or would clearly vote, against it; rather, it is that exactly half of its shareholders would do so. That is not enough for Ocinomled and 50/50 to be considered "actively antagonistic" to the litigation because, with 50% of the ownership on each side, the corporations cannot express their opposition to the initiation of this action.[10] Accordingly, Defendants' motion to realign the parties is granted. If, in the future, the issue of complete diversity arises, the Court will consider Ocinomled and 50/50 to be plaintiffs for that purpose.

## III.   DEFENDANTS' MOTION TO DISMISS

### A.  Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain

---

[10] Defendants are not correct, however, that Plaintiffs' naming of Ocinomled and 50/50 as nominal defendants in the amended complaint was "improper." *See* Defs.' Mem. at 2. That is the default way in which corporations are initially joined in shareholder derivative actions. *See e.g.*, *Liddy v. Urbanek*, 707 F.2d 1222, 1224 (11th Cir. 1983) ("[A]s a practical matter, the corporation is initially named as a defendant. In this way the stockholder insures the presence of the corporation as an indispensable party. Once joined and present before the court, the corporation is then realigned, if necessary, according to its real interests."). Indeed, the very same deadlock that leads the Court to realign the parties here likely would also have rendered it impossible for Plaintiffs to initially join Ocinomled and 50/50 as plaintiffs.

statement of the claim showing that the pleader is entitled to relief."  Rule 8 "does not require

detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Iqbal*, 556 U.S. at 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  (citing *Twombly*,

550 U.S. at 556).  "To survive dismissal, the plaintiff must provide the grounds upon which his claim

rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at

544).

Determining whether a complaint states a plausible claim is a "context-specific task that

requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S.

at 679.  The court must accept all facts alleged in the complaint as true and draw all reasonable

inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008)

(per curiam).  However, a complaint that offers "labels and conclusions" or "naked assertion[s]"

without "further factual enhancement" will not survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678

(citing *Twombly*, 550 U.S. at 555, 557).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a

district court may consider the facts alleged in the complaint, documents attached to the complaint

as exhibits, and documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable

L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted).  "Where a document is not

incorporated by reference, the court may never[the]less consider it where the complaint 'relies

heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."  *Id.*

(quoting *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir. 2006)).  Finally, the Court may also consider "matters of which judicial notice may be taken."  *Allen v. WestPoint-Pepperell, Inc.*, 945 F.3d 40, 44 (2d Cir. 1991).

### B.  Derivative Claims

#### 1.  Trademark Infringement Under 15 U.S.C. § 1114(1)

As noted above, Plaintiffs have brought three federal trademark claims against the Co-Owner Defendants and Defendants Five M, SH, and Delmonico's Distribution.  AC ¶¶ 137-156.  Defendants move to dismiss only the claim brought pursuant to 15 U.S.C. § 1114(1).  They argue that Plaintiffs fail to state a § 1114(1) claim—or, alternatively, that the Court lacks subject matter jurisdiction over this claim—because Plaintiffs do not allege that the Marks are registered.  Defs.' Mem. at 4.  What Plaintiffs do allege is that Ocinomled has "filed an application" for each of the Marks, but that those "applications are currently suspended in accordance with USPTO procedure pending resolution of a concurrent use registration application made by an unrelated party in connection with its operation of an unrelated restaurant using the Delmonico's name in or around Albany, New York."  AC ¶ 24-26.  The Court agrees that this is not enough to sustain a trademark infringement claim pursuant to 15 U.S.C. § 1114(1).

Section 1114(1), by its terms, provides a cause of action for a "registrant" to recover for infringement of a "registered mark."  28 U.S.C. § 1114(1).  The Second Circuit has also made clear that a claim under § 1114(1) lies only where the mark at issued has been registered:

> Section 32(1) of the [Lanham] Act, 15 U.S.C. § 1114(1)—at issue here—protects only registered trademarks.  It provides a cause of action against any person who 'use[s] in commerce any . . . imitation of a registered mark . . . likely to cause confusion, or to cause mistake, or to deceive.'  *Id.*  This cause of action is available, however, only to 'registrant[s]' of the trademarks at issue, a term the Act defines as embracing the actual registrant's 'legal representatives, predecessors, successors and assigns.'  15 U.S.C. § 1127. . . . This provision contrasts with Section 43 of the Act, which allows suits 'by *any person* who believes that he or she is or is likely to be damaged' by the defendant's actions.  15 U.S.C. § 1125(a)(1).

*Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 72 (2d Cir. 2013) (emphasis and

alterations in original); *see also Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, 809 F.3d 737, 741 (2d Cir. 2016) (explaining that 15 U.S.C. § 1114(1) "provides a cause of action for owners of registered trademarks").

Plaintiffs contend that the suspended status of Ocinomled's applications for trademark registration does not deprive them of a § 1114(1) claim because the USPTO suspended the applications "through no fault of Plaintiffs or Ocinomled," due to a third party's concurrent use registration application. Pls.' Mem. at 25. They further argue:

> The [Trademark Trial and Appeal Board ("TTAB")] denied the third-party's application, finding that Ocinomled had superior rights to the DELMONICO'S brand and, as such, the third party was not entitled to register its mark. Shortly thereafter, the third party appealed the TTAB's ruling and such appeal is pending. Ocinomled's registration continues to be stayed until such appeal is resolved. In that regard, and in light of the TTAB's determinations in the third-party's action, it appears that the matter of pending registration is merely ministerial and should not preclude Ocinomled's claim under 15 U.S.C. § 1114(1)(a).

Pls.' Mem. at 25. Plaintiffs cite absolutely no authority for the proposition that an application that is suspended pending an appeal from the TTAB should be considered "registered" or that Plaintiffs should be considered "registrants" under such circumstances. The Court observes that the federal trademark statutes distinguish between the terms "applicant" and "registrant." On one hand, for example, 15 U.S.C. § 1056(a) provides that the USPTO "may require the *applicant* to disclaim an unregistrable component of a mark otherwise registrable." (emphasis added). Similarly, 15 U.S.C. § 1071(a)(1) provides that "[a]n *applicant* for registration of a mark . . . who is dissatisfied with the decision of the Director or Trademark Trial and Appeal Board, may appeal to the United States Court of Appeals for the Federal Circuit." (emphasis added). On the other hand, 15 U.S.C. § 1072 provides that "[r]egistration of a mark on the principal register . . . shall be constructive notice of the *registrant's* claim of ownership thereof." (emphasis added). And 15 U.S.C. § 1055 distinguishes between the two terms in the same provision: "Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of

the *registrant or applicant for registration . . . .*" (emphasis added).  This distinction between the terms "applicant" and "registrant," and particularly the use of both terms in a single provision in § 1055, suggests that Congress would have used both terms in § 1114(1) had it intended that section to apply to marks whose applications for registration are pending.

Defendants also do not cite any authority to support their contention that the concededly "pending" nature of the registration applications is "merely ministerial and should not preclude" their § 1114 claim.  Indeed, the concurrent-use determination is relevant to whether a mark is registrable, *see* 15 U.S.C. § 1052(d); 37 C.F.R. § 2.67, and therefore registration of the Marks does not appear to be a *fait accompli*.  But even if eventual registration were assured, that would not change the fact that the applications are pending rather than registered, and that Ocinomled is an "applicant" rather than a "registrant."

Accordingly, because Plaintiffs allege that Ocinomled has filed an application for the Marks, but that they have not yet been registered, their § 1114(1) claim must be dismissed without prejudice.[11]

## 2.  Conversion

Defendants also move to dismiss Plaintiffs' derivative claim for conversion.  Under New York law, "[a] conversion takes place when someone, intentionally and without authority, assumes

---

[11] The Court would reach the conclusion that Plaintiffs' § 1114 claim must be dismissed under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6), but observes that the issue is probably more appropriately resolved under Rule 12(b)(6).  For one thing, the Second Circuit has recently disavowed use of the term "statutory standing" as "misleading" and "a misnomer."  *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016).  As the court explained:

> The Supreme Court has recently clarified . . . that what has been called "statutory standing" in fact is not a standing issue, but simply a question of whether the particular plaintiff "has a cause of action under the statute."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, [134 S. Ct. 1377, 87 (2014)].  This inquiry "does not belong" to the family of standing inquiries, *id.*, because "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional *power* to adjudicate the case."  *Id.* at 1386 n.4.

*Am. Psychiatric Ass'n*, 821 F.3d at 359.  Additionally, the issue here is not whether Plaintiffs, derivatively on behalf of Ocinomled, are the right persons to bring a § 1114 claim, but rather whether there is any right of action under § 1114 for infringement of an unregistered mark.

or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006). The two elements of conversion are "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 178 (E.D.N.Y. 2010) (quoting *Colavito*, 860 N.E.2d at 717). "Where the property is money, it must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner.'" *Republic of Haiti v. Duvalier*, 626 N.Y.S.2d 472, 475 (App. Div. 1995). Conversely, "if the allegedly converted money is incapable of being described or identified in the same manner as a specific chattel, it is not the proper subject of a conversion action." *Cal Distrib., Inc. v. Cadbury Schweppes Ams. Beverages, Inc.*, No. 06-cv-0496 (RMB), 2007 WL 54534, at *11 (S.D.N.Y. Jan. 5, 2007) (quoting *Interior by Mussa, Ltd. v. Town of Huntington*, 664 N.Y.S.2d 970, 972 (App. Div. 1997)).

With respect to Plaintiffs' derivative conversion claim, the amended complaint summarizes the allegations as follows:

> Defendants inappropriately misappropriated cash, revenues and the goodwill of the Marks that belong to Ocinomled by, among other things:  (i) using Ocinomled's cash receipts and revenue for their own benefit; (ii) misappropriating the goodwill and value of the DELMONICO'S Marks for their own benefit; and (iii) misappropriating federal disaster relief funds paid to Ocinomled for their own use and benefit.

AC ¶ 182.  As already discussed, Plaintiffs support this broad allegation with a variety of more specific allegations.  *See supra* Section I(D)-(E).  They bring this claim against all Defendants, AC at 28, and allege that "Defendants' conversion has damaged Ocinomled in an amount to be determined at trial, but believed to be no less than $5,000,000."  AC ¶ 184.

Defendants' primary challenge to the derivative conversion claim is that "Plaintiffs . . . have entirely failed to allege a specific identifiable sum of money that was converted by Defendants, but rather vaguely asserted 'funds,' 'cash' and 'revenues' had been misappropriated."  Defs.' Mem. at 7.

Similarly, Defendants argue that "Plaintiffs failed to specify the 'value' of the Marks they allege

Defendants converted," and that "an action for conversion of intangible property, such as goodwill,

'will not lie.'" *Id.*  These deficiencies, Defendants argue, require that the Court dismiss the derivative

conversion claim as to all Defendants.  *Id.* at 6-7.  The Court agrees with Defendants in part.

### a. The claim is dismissed to the extent it is premised on the "goodwill and value of the DELMONICO'S Marks."

The Court can easily dispose of that portion of the claim that is premised on

misappropriation of the value and goodwill of the DELMONICO'S Marks.  Typically, "only

tangible property can be the subject of a conversion action, but intangible rights can form the basis

of conversion damages when the converted property is a document into which intangible rights have

merged." *Ancile Inv. Co. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 312 (S.D.N.Y. 2011)

(citations omitted).  This exception has been applied, for example, to permit an action for

conversion of a bill of lading, which confers a right to possession of property being transported by

ship.  *See id.* at 312 (collecting cases).  Similarly, an action for conversion involving intangible

property may be sustained when, in reality, it involves the misappropriation of tangible property that

manifests intangible intellectual property, such as a master recording embodying a musical

performance, *Sporn v. MCA Records, Inc.*, 448 N.E.2d 1324, 1327 (N.Y. 1983), the USPTO's record of

patent ownership, *Harris v. Coleman*, 863 F. Supp. 2d 336, 345 (S.D.N.Y. 2012), and "certificates of

stock, promissory notes, and other papers of value." *Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d

1272, 1276 (N.Y. 2007).[12]

This exception does not apply here.  Because "[a] trademark is not tangible personal

property, but rather is intangible intellectual property having no existence apart from the good will

---

[12] This has sometimes been called the "merger doctrine."  *Harris*, 863 F. Supp. 2d at 345 (describing the doctrine as the recognition that "intangible property may be subject to conversion when represented by a tangible manifestation, such as an electronic or paper record").

of the product or service it symbolizes," it cannot support a claim of conversion.  *Harris*, 863

F. Supp. 2d at 345 (citation omitted); *see also Ortega v. Burgos*, No. 12-cv-5421 (FB), 2014 WL

2124957, at *1 (E.D.N.Y. May 22, 2014); *Fin. Matters, Inc. v. Pepsico, Inc.*, No. 92-cv-7497 (DO), 1993

WL 378844, at *4 (S.D.N.Y. Sept. 24, 1993).  And Plaintiffs do not allege that Defendants converted

any tangible object embodying the Marks. [13]

### b. The claim otherwise survives.

As noted above, Defendants assert that Plaintiffs' derivative conversion claim must be

dismissed in its entirety because Plaintiffs "failed to allege a specific identifiable sum of money that

was converted by Defendant, but rather vaguely asserted 'funds,' 'cash' and 'revenues' had been

misappropriated."  Defs.' Mem. at 7.  The Court disagrees.  The relevant question at the motion-to-

dismiss stage is not whether Plaintiffs have alleged an exact sum of money in their complaint.

Indeed, the case primarily relied upon by Defendants shows that alleging an exact sum of money is

not itself enough to support a conversion claim.  *See, e.g.*, *High View Fund, L.P. v. Hall*, 27 F. Supp. 2d

420, 429 (S.D.N.Y. 1998) (dismissing conversion claim seeking $1 million because "plaintiffs do not

claim ownership of a specifically identifiable, segregated $1 million" (internal quotation marks,

alteration, and citation omitted)).  Rather, the question is whether the money alleged to have been

converted is specifically "identifi*able*" or, put another way, whether it is *capable* of "being described or

identified in the same manner as a specific chattel."  *See, e.g.*, *9310 Third Ave. Assocs, Inc. v. Schaffer

Food Serv. Co.*, 620 N.Y.S.2d 255, 256 (App. Div. 1994) (emphasis added).

The purpose of this limitation is to ensure that the tort of conversion—a property tort—is

applied only where a plaintiff alleges interference with money in which he has a property interest, as

contrasted with a mere right to receive payment.  *See High View Fund*, 27 F. Supp. 2d at 429; *Selinger

Enters., Inc. v. Cassuto*, 860 N.Y.S.2d 533, 536 (App. Div. 2008) ("The mere right to payment cannot

---

[13] The Court observes that Plaintiffs failed to address this issue in their opposition brief, despite the fact that Defendants had raised it in their opening brief.  *See* Defs.' Mem. at 6, 7.

be the basis for a cause of action alleging conversion; the essence of such a cause of action is the 'unauthorized dominion over the thing in question.'" (quoting *Fiorenti v. Cent. Emergency Physicians*, 762 N.Y.S.2d 402, 403 (App. Div. 2003))); *Horn v. Toback*, 989 N.Y.S.2d 779, 782 (App. Term 2014) (holding that defendant was entitled to summary judgment on conversion claim because the claim "seeks merely to recover an allegedly unpaid debt, and does not seek to recover money from a discrete, identifiable fund").  That determination often turns on whether the money alleged to have been converted was contained in a segregated fund of some sort.  *See, e.g.*, *Mfrs. Hanover Tr. Co. v. Chem. Bank*, 559 N.Y.S.2d 704, 712 (App. Div. 1990) ("Money, specifically identifiable and segregated, can be the subject of a conversion action."); *see also Thys v. Fortis Sec. LLC*, 903 N.Y.S.2d 368, 369 (App. Div. 2010) ("An action for conversion of money may be made out where there is a specific, identifiable *fund* and an obligation to return or otherwise treat in a particular manner the specific fund in question." (emphasis added) (internal quotation marks and citation omitted)); *Sperrazza v. Kail*, 699 N.Y.S.2d 609, 610 (App. Div. 1999) (holding that contents of joint bank accounts, which had been withdrawn in their entirety by one of cotenant without consent of the other cotenant, were "sufficiently identifiable to be the subject of a claim for conversion"); *Bankers Tr. Co. v. Cerrato, Sweeney, Cohn, Stahl & Vaccaro*, 590 N.Y.S.2d 201, 385 (App. Div. 1992) (holding that proceeds of a litigation settlement were an "identifiable fund" and thus "a proper subject of a misappropriation and conversion claim"); *Brennan's Bus Serv., Inc. v. Brennan*, 484 N.Y.S.2d 297 (App. Div. 1985) (affirming conversion judgment in favor of plaintiff where defendant withdrew corporate funds invested in certificates of deposit and spent it for non-corporate purposes).

Here, Plaintiffs have alleged that Defendants siphoned money from Delmonico's cash receipts and from claim proceeds paid to Ocinomled by FEMA.  The Court infers that the cash receipts were found either in Delmonico's cash register or in a bank account established to hold Ocinomled's money.  Drawing this plausible inference in favor of Plaintiffs, as it must, the Court finds that this is sufficiently segregated to make the allegedly converted funds "specifically

22

identifiable."  Although Plaintiffs' conversion claim must ultimately be reduced to a definite and specific sum of money, that can be accomplished through discovery.  The allegations that Defendants took control over and misused a particular pot of money that rightfully belonged to Ocinomled are sufficient to survive a motion to dismiss.  *See Hecht v. Components Int'l, Inc.*, 867 N.Y.S.2d 889, 897 (Sup. Ct. 2008) ("When funds are provided for a particular purpose, the use of those funds for an unauthorized purpose constitutes conversion.").

Defendants make few arguments in support of dismissal of the derivative conversion claim aside from the specificity argument just discussed.  To the extent that they argue that the allegations are too vague or conclusory in other respects—an argument they make only at the most cursory level—the Court disagrees.  For example, Defendants argue that Plaintiffs fail to state a claim for conversion against Defendant SH because Plaintiffs have alleged that SH "may have" put Delmonico's up as collateral for the loan they took to develop Delmonico's of Southampton.  Defs.' Mem. at 8.  Defendants contend that this allegation is too speculative to support a claim.  *Id.*  While that may be true, Defendants fail to address the fact that Plaintiffs also allege that SH "used funds received at Delmonico's—which belonged to Ocinomled—to purchase the building that housed Delmonico's of Southampton."  AC ¶ 99.  That allegation is not too speculative or vague.  Defendants will have their opportunity to prevail on this claim on summary judgment or at trial, but the allegations here are sufficient at the pleading stage.

Accordingly, Plaintiffs' derivative claim for conversion is dismissed only to the extent it is premised on the alleged misappropriation of the goodwill and value of the DELMONICO'S Marks. Because such a claim is not cognizable, it is dismissed with prejudice.

### 3.   Breach of the Duty of Loyalty

Defendants also move to dismiss Plaintiffs' claim for breach of the duty of loyalty, which they assert on behalf of Ocinomled and against the Co-Owner Defendants and Defendant Dennis Turcinovic.  Defendants argue only that Plaintiffs fail to state a claim for breach of the duty of

loyalty because the "allegations are nothing more than a series of poorly-disguised conversion claims" and that Plaintiffs have "failed [to] set forth specific facts required for proper pleading of a conversion claim." Defs.' Mem. at 10-11; *see also* Defs.' Reply Mem. at 7 ("Plaintiffs failed to state a claim for conversion, and as their entire basis for the breach of duty of loyalty claim is the conversion claim, the breach of duty of loyalty claim must necessarily fail."). As explained above, however, Plaintiffs have stated a claim for conversion. Accordingly, Defendants have not provided a sufficient basis to grant their motion as to this claim.

### 4.  Breach of Fiduciary Duty

Defendants' motion to dismiss is also denied as to Plaintiffs' claim for breach of fiduciary duty against the Co-Owner Defendants, which Plaintiffs bring derivatively on behalf of both Ocinomled and 50/50. To state a claim for damages for breach of fiduciary duty under New York law, a plaintiff must allege: "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Blum v. Spaha Capital Mgmt., LLC*, 44 F. Supp. 3d 482, 497 (S.D.N.Y. 2014) (quoting *Armentano v. Paraco Gas Corp.*, 935 N.Y.S.2d 304 (App. Div. 2011)). Defendants do not contend that Plaintiffs have failed to adequately allege the existence of a fiduciary relationship. Rather, they argue that Plaintiffs have failed to adequately allege that the Co-Owner Defendants engaged in misconduct.

The amended complaint summarizes the factual allegations underlying Plaintiffs' fiduciary duty claim as follows:

> In a bad faith attempt to wrest power and control over the DELMONICO'S brand away from Ocinomled, Defendants Milan and Branko breached their fiduciary duties to the Nominal Defendants by, among other things: (i) using Ocinomled's funds and resources to benefit unrelated restaurants operated by the corporate defendants; (ii) intentionally misappropriating Ocinomled's Marks without obtaining authorization or providing compensation for such use; and (iii) withholding federal disaster relief funds from Ocinomled and pocketing such funds for their own use and benefit.

AC ¶ 165. The amended complaint further alleges: "In a bad faith attempt to punish Plaintiffs

24

Ferdo and Omer for disputing Defendants' wrongdoing with respect to the DELMONICO'S brand, Defendant Milan [Licul] abused his position in negotiating the lease renewal for Scaletta, interfering with 50/50's ability to reach terms with its landlord."  AC ¶ 167.

With respect to the alleged use of Ocinomled's funds and resources to benefit unrelated restaurants owned by the corporate defendants, Defendants argue only that "Plaintiffs failed to set forth the requisite specificity as to the amount alleged converted, instead conclusorily alleging 'funds' and 'resources.'"  Defs.' Mem. at 11.  The Court has already rejected that argument in the context of Defendants' challenge to Plaintiffs' derivative conversion claim, and it need not do so again here.[14]

With respect to the alleged misappropriation of the Marks, Defendants make a highly limited argument, and that argument is based on a misreading of the amended complaint.  According to Defendants, "Plaintiffs claim that Defendants Milan and Branko breached their fiduciary duties to Ocinomled and 50/50 by conversion of Ocinomled's Mark."  Defs.' Mem. at 11.  They further contend that "[t]he pleading as to 50/50 fails immediately, as there is no allegation that 50/50 has a right to the Delmonico's Mark."  *Id.*  This argument proceeds from a flawed premise.  Defendants are correct that 50/50 is not alleged to hold any ownership interest in the Marks, but the amended complaint does not allege that the misuse of the Marks constituted a breach of a duty owed to 50/50.  Similarly, the amended complaint does not allege that Defendant Milan Licul's purported interference with the Scaletta lease breached a duty owed to Ocinomled.  Instead, the amended complaint is perfectly clear with respect to which allegations pertain to which Nominal Defendant.  *See* AC ¶¶ 165 (alleging misappropriation of Ocinomled's money and Marks), 166 (alleging damages to Ocinomled), 167 (alleging interference with Scaletta's lease), 168-169 (alleging damages to 50/50).

---

[14] In addition, Defendants provide no support for their assumption that the requirements for a conversion claim would apply equally to a fiduciary duty claim merely because both claims arise out of the alleged misappropriation of money.  As explained above, the tort of conversion is a property tort, and the requirement of a specifically identifiable fund serves the purpose of ensuring that plaintiffs can recover for conversion only when they claim interference with a *property* right, as opposed to a mere failure to pay money owed.

To be sure, the amended complaint groups all of these allegations under a single "cause of action," *see* AC ¶¶ 163-169, and it may have been easier to read the amended complaint if Plaintiffs had chosen to separate it into two causes of action, one on behalf of Ocinomled and the other on behalf of 50/50.  But that is no reason to dismiss the claim or any portion of it.

Finally, with respect to Defendant Milan Licul's alleged interference with the Scaletta lease, Defendants argue that, "as a matter of law, Milan cannot interfere with a lease in which he is the signatory on behalf of 50/50 and as a personal guarantor."  Defs.' Mem. at 11-12.  In making this argument, Defendants cite to a case concerning tortious interference with business relations and contracts.  Indeed, they even cross-reference their own argument, contained later in their brief, concerning Plaintiffs' claim for tortious interference.  What Defendants do not do is provide any authority (or even naked argument) with respect to why the elements of tortious interference apply equally to a claim for breach of fiduciary duty.  Put differently, although a claim for tortious interference may be valid only if the alleged interference is committed by one who is not a party to the contract or business relationship,[15] a claim for breach of fiduciary duty merely requires that conduct in breach of a fiduciary duty caused harm.  *Blum*, 44 F. Supp. 3d at 497.  Because Defendants' argument is not addressed to the legal requirements for a fiduciary duty claim, it fails.

Defendants' motion is denied as to Plaintiffs' derivative claim for breach of fiduciary duty.

### 5.  Accounting

Plaintiffs bring their claim for an accounting on behalf of Ocinomled and against all defendants.  "Under New York law, an accounting is a distinct cause of action rooted in equity.  Such action seeks an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due."  *DiTolla v. Doral Dental IPA of N.Y.*, 469 F.3d 271, 275 (2d Cir. 2006) (internal quotation marks and citations omitted).  "Under New York law, the elements of a claim for

---

[15] The Court will address Plaintiffs' claim for tortious interference later in this decision.

an equitable action for an accounting are:  (1) a relationship of a fiduciary or confidential nature; (2) money or property entrusted to the defendant imposing upon him the burden of accounting; (3) the absence of an adequate legal remedy; and (4), in some cases, a demand for an accounting and a refusal." *Matsumura v. Benihana Nat'l Corp.*, No. 06-cv-7609 (NRB), 2007 WL 1489758, at *4 (S.D.N.Y. May 21, 2007).

Defendants argue that Plaintiffs have failed to adequately plead their claim for an accounting as to Defendants Five M, SH Realty, SH Restaurant, Delmonico's Distribution, and Dennis Turcinovic.  Defs.' Mem. at 12-13.  Defendants raise a number of challenges to the sufficiency of that claim, but the Court need only address one of them.  As Defendant correctly state, the amended complaint fails to allege a fiduciary or confidential relationship between Ocinomled and any of those defendants.  Although New York courts have, in some cases, treated an equitable action for an accounting as a legal action for monetary damages where the parties have no fiduciary or confidential relationship, such treatment here would be duplicative and unnecessary.  As the Second Circuit has explained:

> In some cases, the New York courts have held that a fiduciary or confidential relationship is not necessary to obtain judicial relief—but they have done this only by treating the action for accounting as an action at law for monetary relief, and not as an equitable action for accounting. *E.g., Arrow Communications Labs v. Pico Prods. Inc.*, 219 A.D.2d 859, ——, 632 N.Y.S.2d 903, 905 (4th Dep't 1995) ("Where a party seeks an accounting, but the primary demand is for monetary damages, '[t]he accounting is merely a method to determine the amount of the monetary damages.  The action therefore sounds in law and not in equity.'") (citation omitted).  Because the plaintiffs have sought money damages in both their breach of contract and conversion claims, and because discovery as to the measure of damages would be available to them if they were to prevail on those claims, they can obtain all the information they seek in the existing claims at law.  (Obviously, the district court has discretion to bifurcate the proceedings into liability and damages phases, to minimize any unnecessary discovery.)  Accordingly, no useful purpose would be served by treating the plaintiffs' equitable accounting claim as an additional, and duplicative, action at law.  And the district court was correct in implicitly declining to do so.

*Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49 (2d Cir. 1996).  Here, as in *Leveraged Leasing*, Plaintiffs seek money damages in their claims for trademark infringement and

conversion, among others, and they will have an opportunity to seek discovery as to the measure of those damages if they prevail on those claims.  As a result, no useful purpose would be served by treating Plaintiffs' accounting claim as an "additional, and duplicative, action at law."  *See id.*; *see also Matsumura*, 2007 WL 1489758, at *4 (declining to convert accounting claim to claim for monetary damages where plaintiffs had no fiduciary relationship with defendant Haru Holding, because the court found "plaintiff's separate accounting claim against Haru Holding to be duplicative and unnecessary, since plaintiffs could fully recover money damages for the claim pled against Benihana even without Haru Holding as a named defendant.")

Plaintiffs' claim for an accounting is dismissed with prejudice as to Defendants Five M, SH Realty, SH Restaurant, Delmonico's Distribution, and Dennis Turcinovic.

### 6.   Deceptive Trade Practices Under N.Y. Gen. Bus. Law § 349

Defendants also move to dismiss Plaintiffs' § 349 claim, which they bring derivatively on behalf of Ocinomled and against the Co-Owner Defendants as well as Defendants Five M, SH, and Delmonico's Distribution.  To state a claim under § 349, a plaintiff must allege three elements: "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."  *New World Solutions, Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 329 (S.D.N.Y. 2015) (quoting *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000)).  "Whether a representation or an omission, the deceptive practice must be likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Stutman*, 731 N.E.2d at 611-12 (internal quotation marks and citation omitted).  Competitors, as well as consumers, have standing to sue under § 349.  *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) ("The critical question, then, is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor.");  *Burberry Ltd. v. Euro Moda, Inc.*, No. 08-cv-5781 (CM), 2009 WL 1675080, at *16 (S.D.N.Y. June 10, 2009) ("[C]ompetitors also have standing to sue." (citation omitted)); *Tiny Tot Sports, Inc. v. Sporty*

*Baby, LLC*, No. 04-cv-4487 (DLC), 2005 WL 2044944, at *5 (S.D.N.Y. Aug. 24, 2005) ("So long as there is harm to the 'public at large,' a competitor may recover under the statute.'" (citation omitted)).

According to Defendants, "Plaintiffs have entirely failed to allege factual content that Defendants' acts were directed at consumers, or that the acts are misleading in a material way, or that Plaintiffs have been injured as a result." Defs.' Mem. at 14. Defendants are not correct. Plaintiffs have pleaded facts sufficient to give rise to a plausible inference that Defendants engaged in materially misleading conduct, that the conduct was intended to—and, in fact, did—mislead consumers, and that Ocinomled was injured as a result.

With respect to misleading conduct, Plaintiffs point to Defendants allegedly unauthorized use of the DELMONICO's name in connection with Delmonico's Kitchen, Delmonico's of Southampton, and the various sauces, none of which are owned by Ocinomled. AC ¶¶ 39-90, 176. With respect to the consumer-oriented nature of that conduct, they adequately allege that it was "likely to cause confusion, cause mistake or deceive as to an affiliation, connection or association of Defendants with Ocinomled and/or as to the origin, sponsorship or approval of Defendants' products or services by Ocinomled." AC ¶ 177; *see also, e.g.*, AC ¶ 83 (alleging that Defendants "encouraged consumer confusion by mischaracterizing Delmonico's of Southampton as an 'offshoot' of Delmonico's flagship New York City location"). Further, they allege in non-conclusory fashion that Defendants' alleged misuses of the DELMONICO'S name actually did cause consumer confusion. *See, e.g.*, AC ¶ 71 ("For example, several consumer reviews on public websites such as Yelp reflect that consumers believe that Delmonico's Kitchen is affiliated with Ocinomled's famous Delmonico's restaurant.").

Defendants rely for their argument on *Securitron*, in which the Second Circuit held that under § 349, "[i]t is clear that the gravamen of the complaint must be consumer injury or harm to the public interest." 65 F.3d at 264 (internal quotation marks and citation omitted). They also rely on

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741 (N.Y. 1995), which held that a plaintiff "must demonstrate that the acts or practices have a broader impact on consumers at large." Defs.' Mem. at 14 (quoting *Oswego Laborers*, 647 N.E.2d at 744). As explained above, however, Plaintiffs have adequately alleged that Defendants' unauthorized use of the DELMONICO'S name in connection with non-Ocinomled restaurants and products caused consumer harm or injury to the public, and that they had a broad impact on consumers at large inasmuch as such use was likely to cause consumer confusion. *See, e.g., CommScope, Inc. of N.C. v. Commscope (U.S.A.) Int'l Grp. Co.*, 809 F. Supp. 2d 33, 38 (N.D.N.Y. 2011) (holding that plaintiff stated a § 349 claim where plaintiff "alleged facts plausibly suggesting that Defendant intentionally registered its corporate name to be confusingly similar to Plaintiff's CommScope trademark"); *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305 (S.D.N.Y. 2010) (holding that plaintiff was likely to succeed on merits of § 349 claim premised on likelihood of confusion between marks); *Houbigant, Inc. v. ACB Mercantile, Inc.*, 914 F. Supp. 964, 984 (S.D.N.Y. 1995) (holding that plaintiffs stated a § 349 claim where they alleged that defendants imported counterfeit good "with the intent to cause confusion and mistake, to deceive customers as to the source and origin of the products").

Defendants' motion is denied as to Plaintiffs' derivative § 349 claim.

### 7.  Unjust Enrichment

Plaintiffs bring their derivative claim for unjust enrichment on behalf of Ocinomled and against all Defendants. "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009) (citation omitted). To state a claim for unjust enrichment under New York law, a plaintiff must allege that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."

*Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (citation omitted).

Defendants' argument for dismissal of Plaintiffs' derivative unjust enrichment claims is half-baked at best. Aside from an unexplained quotation from a case stating that "[t]o offset on a theory of unjust enrichment, there must first be enrichment," *Indyk v. Habib Bank Ltd.*, 694 F.2d 54, 57 (2d. Cir. 1982), Defendants neither cite nor address any of the elements of an unjust enrichment claim. Instead, they once again hang their hats solely on their contention that Plaintiffs have inadequately pleaded their conversion claim:

> As described in detail (*supra* § A), Plaintiffs have failed to state a claim for conversion, as their claim both lacks the requisite specificity and is for intangible property, neither of which suffices to state a conversion claim. Thus, as Plaintiffs have failed to state a claim for conversion, and as their unjust enrichment claim is grounded in the conversion claim, it necessarily follows that Plaintiffs have failed to state with factual content a claim for unjust enrichment.

Defs.' Mem. at 12 (citations omitted). The Court has held that Plaintiffs stated a claim for conversion; thus, Defendants' argument fails at the gate. But even if Plaintiffs had failed to state such a claim, it would not "necessarily follow[]" that they would also have failed to state a claim for unjust enrichment, since conversion and unjust enrichment are different claims with different elements, stemming from law and equity, respectively. Defendants' argument appears to be founded on an assumption that "enrichment" for purposes of an unjust enrichment claim is synonymous with "conversion"—an assumption for which they offer no support.

Defendants' motion is denied as to Plaintiffs' derivative claim for unjust enrichment.

### 8. Tortious Interference with Business Relationship

Plaintiffs bring their derivative claim for tortious interference with business relationship on behalf of 50/50 and against Defendant Milan Licul for allegedly interfering with the negotiation of 50/50's lease renewal. AC ¶¶ 191-198. To state a claim under New York law for tortious interference with a business relationship—also known as tortious interference with prospective economic advantage—a plaintiff must allege that "(1) it had a business relationship with a third party;

(2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006). As a general rule, the third element is satisfied only where the defendant's conduct "amount[s] to a crime or an independent tort." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004). An exception to that general rule "has been recognized where a defendant engages in conduct 'for the sole purpose of inflicting intentional harm on plaintiffs.'" *Id.* (quoting *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Grp. Inc.*, 628 N.Y.S.2d 408, 410 (App. Div. 1995)).

Defendants' arguments in support of dismissal of this claim are less than crystal clear. First, they appear to argue that the amended complaint does not allege any conduct directed at a third party, but the Court does not agree. "[U]nder New York law, in order for a party to make out a claim for tortious interference with prospective economic advantage, the defendant must interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997) (citing *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d Cir. 1995)); *see also Carvel Corp.*, 818 N.E.2d at 1104 ("[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship.").

The crux of the conduct alleged in the amended complaint is that Licul "took control of the negotiation of the renewal of 50/50's lease with its landlord" and "is intentionally stalling negotiations and purposely refusing to reach terms on 50/50's lease renewal." AC ¶¶ 126-128, 193-194. These allegations give rise to a plausible inference of conduct directed at the landlord, as opposed to conduct directly merely at the Co-Owner Plaintiffs or at 50/50. Indeed, it is difficult to imagine how Licul could "refus[e] to reach terms" without communication with the counterparty to

the negotiations (the landlord).

Defendants also rely on case law concerning the requirements for a claim of tortious interference with contract.  For example, they cite to *Notaro v. Performance Team*, 26 N.Y.S.3d 201, 203 (App. Div. 2016) for the proposition that a defendant cannot tortiously interfere with a contract to which he is a party.  Defendants then attempt to apply that proposition to Plaintiffs' claim by stating that Licul "is the sole signatory and personal guarantor on 50/50's lease."  Defs.' Mem. at 15-16.  This argument fails for at least two reasons.  First, the proposition that a defendant cannot tortiously interfere with his own contract exists in the context of a claim for tortious interference with an existing contract, but the elements of that tort are not the same as the elements of a claim for tortious interference with prospective economic advantage.  *See Carvel Corp.*, 818 N.E.2d at 1103 ("We have recognized that inducing breach of a binding agreement and interfering with a nonbinding 'economic relation' can both be torts, but that the elements of the two torts are not the same.").

Second, this argument relies upon facts that are not alleged in the complaint; namely, that Licul is the sole signatory and personal guarantor on the lease.  As a result, the Court may consider them in resolving this 12(b)(6) motion only if they are contained in a document attached to the complaint, incorporated by reference into the complaint, integral to the complaint, or are properly subject to judicial notice.  *See DiFolco*, 622 F.3d at 111; *Allen*, 945 F.3d at 44.  The lease to which Defendants refer was not attached to the complaint, and Defendants have not provided any alternative basis for the Court to consider it.

In their reply brief, Defendants contend that Plaintiffs' tortious interference claim is moot because it was eventually renewed.  Defs.' Reply Mem. at 3-4.  Defendants cite both to a "Lease Extension" document annexed as an exhibit to their own declaration as well as to a purported concession contained in Plaintiffs' opposition brief.  Defs.' Reply Mem. at 3.  As already explained, the Court cannot consider the document annexed to Defendants' declaration without an adequate

basis to do so, and Defendants have provided none.  Moreover, to the extent that Defendants rely on Plaintiffs' purported concession, the Court is not convinced that it moots the claim.  In their opposition brief, Plaintiffs state:  "Indeed, it was only due to Plaintiffs' efforts to hire counsel and take over negotiations with the landlord that Scaletta's lease was eventually renewed—though Milan's conduct had already resulted in considerable damage."  Pls.' Mem. at 9.  Although Plaintiffs do appear to have conceded that the lease was eventually renewed, they nevertheless clarify that Licul's alleged conduct had already caused injury.  Furthermore, Plaintiffs go on to state that "Milan's interference has not ceased, but rather, has continued through unreasonable refusals to sign lease documentation to finalize the lease renewal."  Pls.' Mem. at 9.  Accordingly, the Court does not view the claim as moot.

Defendants' motion is denied as to Plaintiffs' derivative claim for tortious interference with business relationship.

### C.  Direct Claims

In addition to their derivative claims, Plaintiffs bring direct claims for breach of the duty of loyalty, breach of fiduciary duty, conversion, and unjust enrichment.  AC ¶¶ 199-220.  As a threshold matter, Defendants contend that each of those direct claims must be dismissed because they "conflict with Plaintiffs' derivative claims."  Defs.' Mem. at 17.  Courts in this district "have applied a strict standard in scrutinizing simultaneous direct and derivative claims for signs of conflict." *Cordts-Auth v. Crunk, LLC*, 815 F. Supp. 2d 778, 793 (S.D.N.Y. 2011)(citation omitted).  This scrutiny arises from the imposition by Fed. R. Civ. P. 23.1 of a requirement that the plaintiff "fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association."  *See, e.g.*, *Wall St. Sys., Inc. v. Lemence*, No. 04-cv-5299 (JSR), 2005 WL 292744, at *3 (S.D.N.Y. Feb. 8, 2005).

> While there is always a theoretical conflict of interest in situations where a plaintiff in a single lawsuit seeks redress on behalf of [the corporation] and from [the corporation], it is indisputable that the existence of an actual conflict

34

disqualifies a plaintiff from acting as representative in these dual capacities.
*Cordts-Auth*, 815 F. Supp. 2d at 794 (internal quotations marks and citations omitted). An actual conflict may exist where "substantial recovery on the [direct] claim may reduce the potential recovery on behalf of the corporation on the derivative claim." *Brickman v. Tyco Toys, Inc.*, 731 F. Supp. 101, 108-09 (S.D.N.Y. 1990).

Defendants argue that an actual conflict exists between Plaintiffs' derivative and direct claims here because the direct claims are premised on the Co-Owner Defendants' alleged withholding of the Plaintiffs' salaries. Defs.' Mem. at 17-18.[16] Defendants' argument enjoys some facial validity, since Plaintiffs seek redress through these claims for money owed, but not paid, to them personally. The Court is not convinced, however, that this fact actually renders Plaintiffs in this particular case unable to "fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." Fed. R. Civ. P. 23.1. Defendants have not addressed how the "actual conflict" analysis applies in the context of a closely held corporation, but the Court notes that this case does not involve a typical corporation with widely dispersed shareholders who exist in considerable separation from "the corporation." Instead, Ocinomled and 50/50 are closely held corporations, and the Co-Owner Parties are their only shareholders. As a result, the two plaintiffs are the only shareholders "who are similarly situated in enforcing the right[s]" of those corporations to redress for the Co-Owner Defendants' alleged misconduct. It is difficult to discern how Plaintiffs could not fairly represent themselves.

Accordingly, the Court will not dismiss these, or any other, claims on the basis of a conflict. Instead, the Court will address each of the direct claims on the merits.

---

[16] The amended complaint refers to the wrongful withholding of "distributions." AC ¶¶ 204, 209, 212, 216. In their opening brief, Defendants' argument proceeds on the assumption that Plaintiffs were alleging a failure to issue dividends. Defs.' Mem. at 18-19. In their opposition brief, Plaintiffs clarify that their direct claims do not allege a failure to issue dividends, but rather a failure to pay salaries. Pls.' Mem. at 23 n.8. The Court agrees with Plaintiffs that this is clear from a reading of the amended complaint as a whole. *See id.*

### 1. Breach of the Duty of Loyalty

Defendants' only argument with respect to this claim is that Plaintiffs were not entitled to receive a salary. Defs.' Reply Mem. at 1-3. More specifically, they contend that Plaintiffs have failed to allege an entitlement to a salary because they have failed to plead any of the factors that qualify a person as an "executive employee" under the Fair Labor Standards Act (FLSA). This argument borders on the nonsensical, not least because the purpose of the "executive employee" designation under the FLSA is not to determine eligibility for a salary. Instead, a person who qualifies as an "executive employee" is exempt from the minimum wage and maximum hour requirements of the FLSA. 29 U.S.C. § 213(a)(1). Indeed, Defendants' argument is circular, because one of the elements of the executive employee "test" that Defendants themselves cite is that "[t]he employee must be compensated on a salary basis." Defs.' Reply Mem. at 2. A test that requires that the employee "be compensated on a salary basis" cannot logically be used to determine whether that employee is entitled to a salary.

In the amended complaint, Plaintiffs allege that each of the Co-Owner parties "received regular salaries from Ocinomled," AC ¶ 35, that Plaintiffs were initially paid $500 per week before receiving a raise to $1500 per week, AC ¶ 36, and that the Co-Owner Defendants "unilaterally elected to cut off Plaintiffs' . . . compensation, without explanation." AC ¶ 37. Defendants will have an opportunity to establish on summary judgment or at trial that Plaintiffs had no entitlement to a salary, but what Plaintiffs have alleged is sufficient at the pleading stage.

Defendants' motion is denied as to Plaintiffs' direct claim for breach of the duty of loyalty.

### 2. Breach of Fiduciary Duty

Defendants raise no arguments with respect to Plaintiffs' direct claim for breach of fiduciary duty other than the argument discussed immediately above. Therefore, Defendants' motion is denied as to that claim, as well.

### 3. Conversion

As explained earlier in this decision, "if the allegedly converted money is incapable of being described or identified in the same manner as a specific chattel, it is not the proper subject of a conversion action." *Cal Distrib., Inc.*, 2007 WL 54534, at *11 (quoting *Interior by Mussa*, 664 N.Y.S.2d at 972). And "[t]he mere right to payment cannot be the basis for a cause of action alleging conversion," because "the essence of such a cause of action is the 'unauthorized dominion over the thing in question.'" *Selinger*, 860 N.Y.S.2d at 536 (App. Div. 2008) (quoting *Fiorenti*, 762 N.Y.S.2d at 403).

With respect to their direct conversion claim, Plaintiffs allege that "Defendants inappropriately misappropriated cash and revenues by, among other things, intentionally withholding Ocinomled distributions from Plaintiffs." AC ¶ 212. To the extent that this claim seeks relief for unpaid contributions, it asserts a mere right to payment rather than dominion over a specific and identifiable fund. As a result, while Plaintiffs may seek relief for this allegedly wrongful withholding of their salaries pursuant to their other claims, they may not do so in the form of a conversion claim.

And to the extent that the claim seeks relief for misappropriation of Ocinomled's funds beyond the withholding of salaries, it is more appropriately viewed as a derivative, rather than a direct claim. "New York does not have a clearly articulated test" for whether a claim is direct or derivative, "but approaches the issue on a case by case basis depending on the nature of the allegations." *Yudell v. Gilbert*, 949 N.Y.S.2d 380, 383 (App. Div. 2012). In conducting this case-by-case analysis, New York courts have adopted the framework developed under Delaware law:

> [A] court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

*Id.* at 384 (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004)); *see also*

*id.* at 381 ("The *Tooley* test is consistent with New York law and has the added advantage of providing clear and simple framework to determine whether a claim is direct or derivative."); *SFR Holdings Ltd. v. Rice*, 17 N.Y.S.3d 398, 398-99 (App. Div. 2015) (also applying the *Tooley* test)). "Thus, under *Tooley*, a court should consider '(1) who suffered the alleged harm (the corporation or the stockholders); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders individually).'" *Yudell*, 949 N.Y.S.2d at 384 (quoting *Tooley*, 845 A.2d at 1035).

Applying the *Tooley* test, it is clear that Plaintiffs' alleged direct injury is not independent of any injury to the corporation, since the harm done by the misappropriation of Ocinomled's funds was suffered by Ocinomled. Furthermore, any disgorgement of the allegedly misappropriated funds would inure to the benefit of Ocinomled, and Plaintiffs would benefit only indirectly in their capacities as shareholders.

Accordingly, Defendants' motion is granted as to Plaintiffs' direct claim for conversion. Because this claim fails as a matter of law, rather than as a result of inadequate pleading, it will be dismissed with prejudice.

### 4. Unjust Enrichment

As the Court explained in its analysis of Plaintiffs' derivative claim for unjust enrichment, such a claim differs from a conversion claim in that it does not require a specific and identifiable fund. Instead, it requires a plaintiff to allege that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Georgia Malone & Co.*, 973 N.E.2d at 746. As with their direct claim for conversion, Plaintiffs allege that "Defendants misappropriated cash and revenues belonging to Plaintiffs by, among other things, intentionally withholding Ocinomled's distributions from Plaintiffs." AC ¶ 216. To the extent that Plaintiffs seek to recover for withheld distributions, they may proceed on a claim of unjust enrichment. To the extent they seek to recover for other forms of

misappropriation, however, their claim is properly viewed as derivative for the reasons described immediately above.

Therefore, Defendants' motion is granted to the extent that Plaintiffs' direct claim for unjust enrichment seeks relief for conduct beyond the alleged withholding of contributions.

## IV.   CONCLUSION

For the reasons above, Defendants' motion to realign the parties is GRANTED.  This relief requires no action by the Clerk of Court at this time.  If, in the future, the issue of complete diversity arises in this action, the Court will consider Ocinomled and 50/50 to be plaintiffs for that purpose.

Defendants' motion to dismiss the amended complaint is GRANTED IN PART and DENIED IN PART:

Plaintiffs' derivative claim for trademark infringement pursuant to 15 U.S.C. § 1114(1) is dismissed in its entirety without prejudice.

Plaintiffs' derivative claim for conversion is dismissed with prejudice only to the extent that it is premised on the alleged misappropriation of the goodwill and value of the DELMONICO'S Marks.

Plaintiffs' derivative claim for an accounting is dismissed with prejudice as to Defendants Five M, SH Realty, SH Restaurant, Delmonico's Distribution, and Dennis Turcinovic.

Plaintiffs' direct claim for conversion is dismissed in its entirety with prejudice.

Plaintiffs' direct claim for unjust enrichment is dismissed with prejudice only to the extent that it seeks relief for conduct beyond the alleged withholding of contributions.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 38.


SO ORDERED.

Dated:  January 26, 2017
New York, New York

_____
GREGORY H. WOODS
United States District Judge